**UNITED STATES of America et al.**

v.

**The CITY OF PROVIDENCE.**

**Civ. A. No. 77–0374.**

United States District Court,
D. Rhode Island.

May 2, 1980.

---

Everett C. Sammartino, Asst. U. S. Atty., Providence, R. I., Raymond W. Mushal, Atty., Pollution Control Section, Land and Natural Resources Division, Dept. of Justice, Washington, D. C., R. Daniel Prentiss, Chief Legal Counsel, Dept. of Environmental Management, Providence, R. I., Daniel J. Schatz, Sp. Asst. Atty. Gen., Providence, R. I., J. Michael Keating, Jr., McKinnon & Fortunato, Pawtucket, R. I., Steven J. Ferdinandi, Pawtucket, R. I., for plaintiffs.

Gerard McG. Decelles, Sp. Counsel, Providence, R. I., for defendant.

## OPINION

FRANCIS J. BOYLE, District Judge.

This action involves the enforcement of an Amended Consent Decree[1] entered on October 27, 1978. Defendant City of Providence has moved to modify the Decree and Plaintiff State of Rhode Island and Intervenor Plaintiff Save the Bay, Inc. have moved to have Defendant City of Providence adjudged in contempt of the Decree. Plaintiff United States has opposed modification of the Decree entered October 27, 1978, and, although supporting, has not joined in the Motion to Adjudge Defendant City of Providence in Contempt. Intervenor, Local Union 1033 of the Laborers' International Union of North America, AFL–CIO, in part supports the application for a contempt finding.

Initially, the Court considered only the Motion to Modify the Decree, and upon filing of the Motion to Adjudge in Contempt, heard both on a consolidated record.

This action was commenced by the United States, through the Environmental Protection Agency, and the State of Rhode Island, through the Department of Environmental Management, on June 15, 1977, alleging that the Defendant City was in violation of the Federal Water Pollution Control Act as amended, 33 U.S.C. § 1251 (1978) *et seq.*, by reason of the City's failure to attain the effluent limits specified in National Pollutant Discharge Elimination System Permit Number RI0100315 [hereinafter "Permit"], issued by the Environmental Protection Agency to the City on April 3, 1979. The Permit was issued for the Fields Point Wastewater Treatment Plant [hereinafter "Fields Point Plant"] which had been operated by the City since the turn of the century.

The Fields Point Plant has a design capacity of 64 million gallons per day (average daily flow). The effluent is discharged into Narragansett Bay. Narragansett Bay bisects the State of Rhode Island from Providence on the north to the southern boundaries of the State. It is a salt water bay which ultimately empties into the Atlantic Ocean and is a valuable natural resource of the State providing not only the means for commercial shipping and water travel but also areas of shell and fin fishing, as well as providing recreational opportunities for the residents of this area. The City of Providence and other highly industrialized areas are located near its headwaters.

The Fields Point Plant is designed to provide both primary and secondary treatment of wastewater from the City of Providence and a portion of the wastewater from other nearby communities. The purpose of primary treatment is to remove pollutants that will either settle, such as heavier suspended solids, or float, such as grease. Secondary treatment is to be accomplished by the use of an activated sludge process in which a mixture of wastewater and biological sludge, called a biomass, is agitated and aerated, with the result that the micro-organisms in the biomass absorb the harmful organisms in the wastewater, forming large clumps which settle and can be then separated from the wastewater. As a final step in the process, before the effluent is discharged into Narragansett Bay, it is treated with chlorine in order to kill pathogenic or disease-causing bacteria and viruses.

The permit requirements of the Federal Water Pollution Control Act were adopted in 1972. This legislation represented a shift in emphasis from the previous policy to regulate water pollution in navigable waters based upon water quality of the waters to a system of controls based upon the quality of the effluent discharged into those waters. *See EPA v. State Water Resources Control Bd.*, 426 U.S. 200, 204–205, 96 S.Ct. 2022, 2024, 2025, 48 L.Ed.2d 578 (1976). Specific provisions were made in the Act for compliance by both industry and local governments. 33 U.S.C. § 1311 (1978). As it relates to the City of Provi-

---

1. Fed.R.Civ.P. 54(a) provides: " 'Judgment' as used in these rules includes a decree and any order from which an appeal lies." The parties refer to this document as a decree, and it is entitled as such; however, it would more properly be called a judgment. *See* Wright & Miller, Federal Practice and Procedure: Civil § 2651 (1973).

dence, the Act required the City to provide at least secondary treatment of its wastewater not later than July 1, 1977. 33 U.S.C. § 1311(b)(1)(B) (1978). There is no disagreement that at the time that this action was commenced, the plant was not capable of either primary or secondary treatment and, at best, provided sporadic chemical treatment of wastewater.

The plant had last been overhauled in 1965 and provided primary and secondary treatment into 1974. By 1977 it was, for all practical purposes, shut down. This situation represented not only a violation of the Act but also an obvious health hazard to the residents of this State.

It is asserted, and not contradicted, that the City is the largest single source of effluent discharge along the entire length of the Bay.

Due to neglect, the equipment for treatment became inoperable, and indeed was in such a bad state of disrepair that the extent of work to be done on some of the equipment could not be ascertained until an estimated 11,000 cubic yards of solidified sludge were removed from some of the tanks in the system. This sludge presented a substantial problem since it was the solid remnants of accumulated sewage which had to be lifted from the tanks and disposed of in a safe and sanitary manner. These facts were certainly known to the City authorities on June 15, 1977, when this action was commenced.[2]

It was in this factual setting that the City agreed to the terms of the first Consent Decree on June 17, 1977, two days after this action was begun. That Decree which was entered by the Court on August 10, 1977, is not substantially different from the Amended Consent Decree, which was entered on October 27, 1978, and which is the subject of this action. Both decrees set a specific date upon which the plant would become operable and a specific date upon which the plant would comply with the effluent quality standards of the Permit.

The first Decree provided that the City would "complete the repair and restoration of said water pollution control facilities and equipment" by May 1, 1978, and that it would meet the effluent quality standards by June 1, 1978.

The Amended Consent Decree provided that the City would "complete the repair and restoration" and commence operation of water pollution control facilities and equipment at the Fields Point Plant by September 23, 1979; that by November 23, 1979, "the City shall demonstrate to the satisfaction of EPA that its water pollution control facilities and equipment achieve the effluent limits specified in . . ." the Permit; and additionally that it would present "a contingency plan for alternate, environmentally acceptable method(s)" for sludge disposal by September 7, 1979.

Both consent decrees were signed by the highest authorities of the City and entered by a Judge of this Court. They specifically apply to and are binding upon "the defendant, its officers, directors, agents, servants, employees . . . and all persons, firms and corporations acting under, through and for it."

The City has not demonstrated to the Environmental Protection Agency that its water pollution control facilities and equipment achieved the effluent limits specified in the Permit, as required. The plant equipment was not operable on September 23, 1979, and was not operable on April 8, 1980. The biomass which is essential to secondary treatment had not been established, and still requires more time for its cultivation. Telescoping valves necessary to return activated sludge to the aeration tanks were still inadequate and require replacement. All aeration tanks were not in operation due to the fact that two of five blowers were inoperable, and one of four sludge holding tanks was not operable. As of March 21, 1980, effluent limits set by the Permit were still being regularly exceeded for biochemical oxygen demand, suspended

2. The facts were unquestionably known to the City when it agreed to the Amended Consent Decree on October 27, 1978 since the City's method of accumulated sludge disposal was approved by the Department of Environmental Management on October 13, 1978.

solids, settleable solids and fecal coliform bacteria. Significantly, the City was unable to estimate when, if ever, the requirements of the Decree would be met.

The City submitted evidence to establish that it had been delayed for up to eight weeks because it was required to obtain a permit from the Department of Environmental Management to dispose of accumulated sludge. Although the City was clearly aware of this requirement as early as 1977, it waited until August of 1978 to seriously discuss this matter with the Department of Environmental Management, did not apply for a permit until September of 1978, and after its application was given the most prompt attention and granted on October 13, 1978, changed its plans which required it to seek additional approval. Again, the Department of Environmental Management acted with unusual dispatch. Whatever delay was occasioned by the lack of a permit must be laid solely at the feet of the City officials, who, although aware of the problem, simply delayed making a prompt application. The time required for the two approvals given to the City cannot be considered to be the responsibility of the State of Rhode Island or its Department of Environmental Management.

The Federal Water Pollution Control Act was adopted by the Congress of the United States "to restore and maintain the chemical, physical and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a) (1978); established as a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985," 33 U.S.C. § 1251(a)(1) (1978); and provides that "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983." 33 U.S.C. § 1251(a)(2) (1978). *Costle v. Pacific Legal Foundation,* —— U.S. ——, ——, 100 S.Ct. 1095, 1097, 63 L.Ed.2d 329 (Mar. 18, 1980).

In general, the course plotted by Congress to accomplish the goal of elimination of discharge of pollutants is to be preceded by an interim stage in which discharges into

navigable waters will be regulated. The process chosen by the Congress to regulate discharges is a system of licensing whereby permits are granted to those discharging into the Nation's waterways. The initial effort at regulation had established standards for the acceptable levels of pollution in a state's navigable waters. This was an effort to regulate the effect of pollution upon the quality of water. In 1972, the focus was shifted to preventable causes of pollution. *EPA v. State Water Resources Control Bd., supra,* 426 U.S. at 202–203, 96 S.Ct. at 2023–2024. The system of regulation existing in 1972 had achieved a notable lack of success to the extent that it was considered to be "inadequate in every vital aspect." *Id.* at 203, 96 S.Ct. at 2024. The 1972 amendment accomplished two basic changes in the regulatory scheme; it provided for the establishment of maximum effluent limitations on "point sources," i. e. places of discharge of effluent; and secondly, it established the National Pollutant Discharge Elimination System which provided that it was unlawful to discharge pollutants without obtaining a permit and complying with its terms. Permits were to be secured in the first instance from the Environmental Protection Agency. However, in recognition of the interest of the States and in order to encourage their continued interest in reducing and ultimately eliminating pollution, Congress provided that a state program approved by Environmental Protection Agency could issue permits. *EPA v. State Water Resources Control Bd., supra,* at 202–209, 96 S.Ct. at 2023–2026.

■ It has long been recognized in Rhode Island law that a municipal corporation may not acquire a prescriptive right to deposit sewage in the waters of Narragansett Bay, and that the expense of avoiding the discharge of sewage is no defense to an order to abate pollution. *Board of Purification of Waters v. Town of Bristol,* 51 R.I. 243, 153 A. 879 (1931); *Board of Purification of Waters v. Town of East Providence,* 47 R.I. 431, 133 A. 812 (1926). The policy and purpose of the Federal Water Pollution Control Act is consistent with what has

been the law of this State for a considerable period of time.

In accord with the provisions of the Act, the Permit was issued to the City of Providence as an authorization to discharge under the National Pollutant Discharge System by the Environmental Protection Agency. The initial permit was issued December 5, 1974, and expired June 30, 1977. The existing Permit was issued April 3, 1979, and imposed more stringent requirements than those contained in the initial permit. Both permits, in accord with the Environmental Protection Agency practice, bear the same number. The permits imposed limitations concerning permissible effluent characteristics.[3] Among other limitations, effluent characteristics were specifically limited with respect to flow, biochemical oxygen demand, total suspended solids, settleable solids and fecal coliform bacteria. Discharge limitations were stated in terms of maximum daily, monthly and weekly average, either stated in pounds or kilograms per day or in specific units. The permits contained other limitations not now relevant. On April 3, 1979, the Environmental Protection Agency issued a "Findings of Violation and Order for Compliance." As it applies to this action, the Order in part provided that: "From September 23, 1979 to November 23, 1979, the City shall operate the rehabilitated treatment plant providing an effluent at least equal in quality to primary treatment plus disinfection and approach the interim limits as required after November 23, 1979." The Order also provided that for the period beginning November 23, 1979 through July 1, 1983, the discharge from the Fields Point Plant shall comply with effluent limitations which were less stringent than the limitations imposed by the existing Permit.[4] It is the more liberal limitations that the Plaintiffs State of Rhode Island and Save the Bay, Inc. now contend are being violated and by

reason of which the City should be held to be in contempt of the Amended Consent Decree. (Attached at the end hereof is a schedule entitled "Providence Wastewater Treatment Facility, Effluent Grab Sample Results" which was prepared by the State of Rhode Island Department of Environmental Management and which is a summary of Plaintiffs' Exhibit No. 39.) Plaintiffs have demonstrated clearly and convincingly that the City has failed after November 23, 1979, to comply with its Permit as modified by the Environmental Protection Agency Order of April 3, 1979.

The City has failed to comply with the requirements of the Amended Consent Decree in at least three particulars: (1) it did not comply with the requirement that the City complete the repair and restoration of the water pollution control facilities and equipment at the Fields Point Plant and commence operations by September 23, 1979; (2) it did not attain operational level of the water control facilities at the Fields Point Plant by November 23, 1979, meaning that the City has not demonstrated to the satisfaction of the Environmental Protection Agency that its water pollution control facilities and equipment achieved the effluent limits specified in the Permit as modified by the Order of April 3, 1979, and (3) it did not develop a contingency plan for the disposal of its sludge produced in plant operation in the event of the disruption of the operation of an incinerator for any period which exceeds the storage capacity of the Plant. The City has recently arranged for the disposal of sludge produced in plant operation by means of an agreement to permit disposal at a landfill area.

The Amended Consent Decree provided that the City will pay a civil penalty in the amount of $2,500 for each day that the City is in violation of any requirement of the Amended Consent Decree, to the Treasurer of the United States, within fourteen days

---

**3.** Limitations are based upon EPA Secondary Treatment Information, 40 C.F.R. §§ 133.100 *et seq.* (1979).

**4.** Actually, the limitations imposed in the Order were those contained in the earlier permit granted December 5, 1974 which expired June 30, 1977, the date set by Congress for a requirement of secondary treatment. The existing Permit was issued on the same date as the Order, that is, April 3, 1979.

of demand by the United States Attorney. No such demand has been made. Although the United States is a party to this action, it does not seek at this time to enforce this provision, reserving to itself the right to do so at some later time, and professing a desire to avoid repetitive applications to the Court in order to conserve judicial resources.

The effect of the Amended Consent Decree was beneficial to the City of Providence in that it limited the civil penalties which could be assessed to $2,500 a day, and it, in effect, absolved the City from any penalties for which it was undoubtedly liable prior to September of 1979. The maximum civil penalty which could be imposed is $10,000 per day. 33 U.S.C. § 1319(d) (1978).

## MOTION TO MODIFY THE AMENDED CONSENT DECREE

■ The City contends that it should be relieved from the strictures of the Amended Consent Decree because unanticipated conditions arose which, in spite of its good faith efforts to comply, rendered it impossible to comply. This contention flies in the face of evidence introduced by the City which suggests that from the outset the City was aware that it could not meet the terms of the Decree, but that, in substance, the City was compelled to consent to the Decree. If this view were to be adopted by this Court, the Court would be required to come to the conclusion that the City had misled the Court when it assented to the Decree, representing, at least implicitly, that its actions were completely voluntary. In light of the serious consequences which could flow from such a determination, the Court construes this testimony to mean that although it may have had some reservations concerning its ability to comply, it was determined to do so in spite of the obstacles which lay in its path. The Court is not prepared to conclude that it was the intention of the City to mislead the Court at the time the Amended Consent Decree was entered and that the City did not fully intend to carry out its provisions to the letter.

The essence of the City's assertion of impossibility is the contention that the State of Rhode Island, through the Department of Environmental Management, delayed permits relating to the removal and disposition of sludge which had accumulated within the plant's equipment. This contention must fail. Not only did the State not delay action upon the City's request, it expedited all of the City's requests. The State promptly acted and reacted to all the City's requests to a degree that must be characterized as nothing short of remarkable, viewed from the perspective of delay which one might expect of an administrative Agency. The City takes nothing by this contention.

The City also suggests that labor problems and sabotage have added to its burden in meeting the requirements of the Decree. There is no evidence which supports the City's suggestion.

The City clearly knew what its obligations were under the Decree. It must have been aware in late 1972 of the Congressionally mandated requirement that it provide primary and secondary treatment no later than June 30, 1974, when the Congress in 1972 adopted that requirement. (By amendment, the date was changed to July 1, 1977). It must have been aware that the provisions of the Amended Consent Decree allowed to it a further margin of time within which to meet the requirements of the Federal Water Pollution Control Act. It has not established any sound reason why this Court should permit it to avoid the terms of its agreement with the parties to this action and endorsed by the Court upon an at least implicit representation that it intended to comply with the Decree. The City has reaped a substantial reward by virtue of the Decree. Now it desires to change the bargain which it made. It may not do so.

The City argues that the Decree by its terms was subject to modification. It points to Paragraph IX of the Decree whereby jurisdiction is retained by this Court "for the modification or termination of any of the provisions thereof . . . ."

as a basis for the contention that the Decree was conditioned upon a later modification depending upon changing circumstances. There are two appropriate responses to this contention: (1) there is no credible evidence of changing circumstances, and (2) the provision states no more than the underlying conditions incident to any decree of this Court.

In *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the Supreme Court held that there was power to modify previously entered decrees but only in limited situations. The first principle must be that parties, who freely enter into agreements which they submit to the Court as their free act and which they ask the Court to enter, are to be bound to their agreement. Though the consequences are no different, there is with respect to a consent decree the additional fact that it is not only the decree of the Court, but it is also the agreement of the parties. Whatever departure is permitted from a consent decree, must be based upon solid reason. Thus in *United States v. Swift & Co., supra,* the Court considered two aspects. The first is that any change must relate prospectively, that is, that modification should not relate to "rights fully accrued upon facts so nearly permanent as to be substantially impervious to change . . .". *Id.* at 114, 52 S.Ct. at 462. Although the City's Motion to Modify was filed before the expiration of the September 23, 1979 deadline (it was filed September 21, 1979), the changes which it seeks to make would alter rights essentially accrued at the time. With respect to future events, the Court in *United States v. Swift & Co.,* quite clearly defined the second aspect, circumstances which would permit a prospective modification, and that is that the Court should be satisfied that its decree, through changing circumstances had become an instrument of "wrong". *Id.* at 115, 52 S.Ct. at 462. As the Court stated at page 119, 52 S.Ct. at page 464:

No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

It certainly cannot be said that the City is a victim of oppression. At the very best, the facts admit of the conclusion that in spite of the efforts of the City to comply, it has failed. There is no grievous wrong inflicted upon the City in refusing its unilateral request to modify a form of agreement, which having been twice entered into, relieved the City of the consequences of its first agreement and continuing civil liabilities in a substantial amount.

The modification which the City seeks is really an additional period of time to November 23, 1979, and some indefinite period thereafter to comply with the Decree. A further reason for refusing the request is that it will serve no useful purpose, since the City cannot suggest that it will comply by that date, it already having failed to do so, and is unable to state when, if ever, it will comply.

Accordingly, the City's Motion to Modify the Consent Decree entered October 27, 1978, is denied.

MOTION TO ADJUDGE IN CONTEMPT

The City has failed to comply with the terms of the Amended Consent Decree. Since this is the second of two consent decrees, both entered into in order to provide the City further time to meet its obligations, and since the City is now unable to predict when, if ever it will comply, there is here more than a technical violation of the Decree. It must be concluded that the City did not take the matter seriously enough to see to it that it performed its part of the bargain which was to comply with the Order of the Court. It has provided no justifiable excuse which the Court can accept for its failure. It is, therefore, in contempt of the Amended Consent Decree entered October 27, 1978. The State of Rhode Island and Save the Bay, Inc. both seek to require

the City to comply with the Decree. As earlier stated the United States has not moved for a contempt finding, and does not oppose such a finding. The nature of this proceeding is civil, as distinguished from criminal contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Penfield Co. v. Sec. Exch. Comm'n,* 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); *Nye v. United States,* 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941); *Parker v. United States,* 153 F.2d 66 (1st Cir. 1946). One of the distinctive characteristics of civil contempt is that the contemner is to be given an opportunity to purge the contempt. *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); *O., C. & Atomic Workers Int'l Union, AFL–CIO v. NLRB,* 547 F.2d 575, 581 (D.C.Cir. 1977). This is not to say that the Court is foreclosed with respect to damage already accrued. It is not. But the guilty party in a civil contempt proceeding must be given the opportunity to attempt to right the wrong. This doctrine is graphically described as permitting contemners to " 'carry the keys of their prison in their own pockets.' " *Penfield Co. v. Sec. Exch. Comm'n, supra,* 330 U.S. at 590, 67 S.Ct. at 921. Of course, the analogy does not literally apply to a municipal corporation guilty of contempt.

■ In this action, and considering the deadlines of the Decree which have passed, the wrong cannot be fully righted, but by affording the City an opportunity to right so much of the wrong as it may, will accomplish, hopefully, two objectives: (1) it will result in compliance, though tardy, with the Decree, and (2) it will define the limits of the wrong which the City has done. The City will still face all other means to require compliance available to this Court.[5] The Court would note that although no City officers are specifically before the Court, the Decree is specifically binding upon them, and that they also might be brought

before the Court and be required to adhere to the provisions of the Amended Consent Decree. *Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 352 (7th Cir. 1976). *This is said only to suggest to the City that a change in its attitude with respect to its obligations under the Amended Consent Decree could have a substantial effect upon the outcome of this proceeding, and that the City should now begin to take its obligations more seriously, particularly obligations to which it has agreed to its advantage. Furthermore, a fine imposed upon the City would merely go to diminish the limited resources which the City has to comply with the Decree. A fine would penalize the taxpayers of the City for an offense which was not directly committed by them. If damages are required, it may be that the Court will have to examine the possibility of other sources of recompense.*

The State of Rhode Island has sought the appointment of a receiver who would assume management of the plant under the direction of the Court and at the expense of the City. The Intervenor Plaintiff would have this Court appoint a Master who would examine the factual circumstances and report to the Court. The Court does not exclude the possibility that at some time in the future either course may be an appropriate means to prevent further despoilation of a valuable public asset. Now is not the appropriate time. The Court is not prepared at this time to determine that the City as an arm of government cannot manage the facility given the will and determination to do so. However, the burden is clearly upon the City to establish convincingly that it has the ability to manage its own affairs without harm accruing to the interests of the entire state. A fact finding mission in the form of a Master is also presently uncalled for. Essentially, there is but one factual determination to be made, and that is whether the quality of the ef-

---

5. These remedies are as expansive as necessary to accomplish the task. They include authority to designate the City's Chief Executive as receiver to be personally answerable to the Court for the operation of the plant. *See United States v. City of Detroit,* 476 F.Supp. 512, 520 (E.D.Mich., 1979). *See generally* Note, *Implementation Problems in Institutional Reform Litigation,* 91 Harv.L.Rev. 428 (1977); Note, *Monitors: A New Equitable Remedy?,* 70 Yale L.J. 103 (1960).

fluent which the City of Providence continues to dump into Narragansett Bay is or is not within the terms of its Permit. A Master at this time would not add significantly to the ability of the Court to seek compliance with its Decree.

The Court must be aware of efforts underway to establish a Regional Sewer Authority to assume responsibility which the City now bears for the treatment of its wastewater. The fact that there are efforts to resolve the present requirement of no pollutant discharge will not be viewed as a mitigation of the duty of the City to proceed forthwith to remedy its failure to comply. *See Coalition of Black Leadership v. Cianci*, 570 F.2d 12, 14 (1st Cir. 1978). It must be assumed that the City entered into the Amended Consent Decree after mature consideration and consultation with those who could advise the City of its capability to provide secondary treatment, in accord with the terms of the Amended Consent Decree. Whether or not efforts to create a Regional Sewer Authority will succeed depends upon many factors, some of which are beyond the control of the City. If such efforts do succeed, they may well be of advantage to the entire public. However, the Court and the parties before it must proceed on the basis of the circumstances as they presently exist, and the Court will not assume that such efforts, however meritorious, will succeed.

Accordingly, the City of Providence will be allowed a period of ninety days to demonstrate compliance with the terms of the Amended Consent Decree. During this period of time, the State of Rhode Island, through the Department of Environmental Management, is directed to continue to monitor the quality of plant effluent daily, weekly and monthly and to report its findings to this Court. The City shall file with the Court copies of the monthly reports it is required to file with Environmental Protection Agency and the Rhode Island Department of Environmental Management as set forth at pages 8 and 9 of its Permit, and shall with each monthly filing, file a statement signed by a responsible officer of the City which shall, in affidavit form, state whether or not the City has complied with the Permit limitations, and, if not, shall detail the reasons for the City's failure to comply.

This Court's determination should not be viewed as an extension of the time limitations embodied in the Amended Consent Decree. It is not. It is to be viewed as an opportunity for the City to establish its good faith purpose to remedy a wrong that has already occurred, with an expectation that its efforts, if successful, may have a bearing upon the ultimate disposition of this matter. Following the expiration of the time allowed to the City to purge itself of contempt, the Court will again hear the parties to determine the further course of this litigation. Further, the Court will consider an appropriate disposition of the justified complaint of the State of Rhode Island and Intervenor Save the Bay, Inc. for the violation which has already occurred. Additionally, the Court makes no disposition concerning the civil penalty agreed upon by the City since that matter is not now before it.

Plaintiffs may prepare and present a form of Order in accord with this Opinion.

SO ORDERED.

. Providence Wastewater Treatment Facility
Effluent Grab Sample Results

| NPDES Permit Limits | BOD [1] Monthly Avg. = 40 mg/1 Max. Day = 60 mg/1 | Suspended Solids [2] Monthly Avg. = 45 mg/1 Max. Day = 65 mg/1 | Settleable Solids [3] Weekly Avg. = .5 ml/1 Max. Day = 1.0 ml/1 | Fecal Coliforms [4] Monthly Avg. = 200/100 ml Max. Day = 400/100 ml |
|---|---|---|---|---|
| 26 Nov. 79 | | 24 | 1.0 | ≤ .23 |
| 27 Nov. 79 | | 50 | .6 | 90,000 * |
| 29 Nov. 79 | 58 | 80 * | 1.0 | 40 |
| 30 Nov. 79 | 102 * | 62 | 4.0 * | 930,000 * |
| 4 Dec. 79 | | 84 * | 2.5 * | 210,000 * |
| 5 Dec. 79 | 58 | 72 * | 4.0 * | 9,000 * |
| 6 Dec. 79 | 80 * | 52 | 1.5 * | 700 * |
| 7 Dec. 79 | 46 | 50 | 1.5 * | 90 |
| 10 Dec. 79 | | 38 | Trace | 23 |

Providence Wastewater Treatment Facility
Effluent Grab Sample Results

| NPDES Permit Limits | BOD [1] Monthly Avg. = 40 mg/1 Max. Day = 60 mg/1 | Suspended Solids [2] Monthly Avg. = 45 mg/1 Max. Day = 65 mg/1 | Settleable Solids [3] Weekly Avg. = .5 ml/1 Max. Day = 1.0 ml/1 | Fecal Coliforms [4] Monthly Avg. = 200/100 ml Max. Day = 400/100 ml |
|---|---|---|---|---|
| 11 Dec. 79 | | 42 | .8 | 1,100 * |
| 12 Dec. 79 | 86 * | 58 | 2.0 * | < 23 |
| 13 Dec. 79 | 89 * | 74 * | 1.0 | 230 |
| 14 Dec. 79 | 86 * | 68 * | Trace | 15,000 * |
| 17 Dec. 79 | | 76 * | 3.5 * | 23,000 * |
| 18 Dec. 79 | | 62 | 1.0 | 40 |
| 19 Dec. 79 | 100 * | 98 * | 4.0 * | 40,000 * |
| 20 Dec. 79 | | 66 * | 1.0 | 150 |
| 21 Dec. 79 | 73 * | 78 * | 1.5 * | 43,000 * |

[1] BOD = Biochemical oxygen demand: The amount of oxygen required for the aerobic biological oxidation of the organic solids in a sewage or waste

[2] Suspended Solids = The quantity of material deposited when a quantity of water, sewage, or other liquid is filtered through an asbestos mat in a gooch crucible

[3] Settleable Solids = Suspended solids which will subside (sink) in quiescent water, sewage, or other liquid in a reasonable period. In the wastewater field, one hour is commonly, though arbitrarily, used

[4] Fecal Coliforms = A group of bacteria which predominantly inhabit the intestinal tract of man. Amounts of the bacteria present are used to determine degree of water pollution by sewage

* Indicates values exceed maximum per day NPDES permit limits

Providence Wastewater Treatment Facility
Effluent Composite Sample Results

| NPDES Permit Limits | BOD [1] Monthly Avg. = 40 mg/1 Max. Day = 60 mg/1 | Suspended Solids [2] Monthly Avg. = 45 mg/1 Max. Day = 65 mg/1 | Settleable Solids [3] Weekly Avg. = .5 ml/1 Max. Day = 1.0 ml/1 | Fecal Coliforms [4] Monthly Avg. = 200/100 ml Max. Day = 400/100 ml |
|---|---|---|---|---|
| 23 Nov. 79 | 76 * | 152 * | 1.0 | 2,300 * |
| 27 Nov. 79 | 36 | 26 | Trace | 90,000 * |
| 30 Nov. 79 | 92 * | 46 | 1.5 * | 930,000 * |
| 5 Dec. 79 | 85 * | 98 * | 4.0 * | 9,000 * |
| 6 Dec. 79 | 125 * | 78 * | Trace | 700 * |
| 7 Dec. 79 | 85 * | 80 * | 2.5 * | 90 |
| 12 Dec. 79 | 97 * | 70 * | 2.0 * | 23 |
| 13 Dec. 79 | 83 * | 82 * | 1.7 * | 230 |
| 14 Dec. 79 | 87 * | 100 * | 2.5 * | 15,000 * |

[1] BOD = Biochemical oxygen demand: The amount of oxygen required for the aerobic biological oxidation of the organic solids in a sewage or waste

[2] Suspended Solids = The quantity of material deposited when a quantity of water, sewage, or other liquid is filtered through an asbestos mat in a gooch crucible

[3] Settleable Solids = Suspended solids which will subside (sink) in quiescent water, sewage, or other liquid in a reasonable period. In the wastewater field, one hour is commonly, though arbitrarily, used

[4] Fecal Coliforms = A group of bacteria which predominantly inhabit the intestinal tract of man. Amounts of the bacteria present are used to determine degree of water pollution by sewage

* Indicates values exceed maximum per day NPDES permit limits