## SPALLONE *v.* UNITED STATES ET AL.

No. 88–854.   Argued October 2, 1989—Decided January 10, 1990*

*Together with No. 88–856, *Chema* v. *United States et al.*, and No. 88–870, *Longo et al.* v. *United States et al.*, also on certiorari to the same court.

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 281.

*James D. Harmon, Jr.*, argued the cause for petitioners in all cases and filed briefs for petitioner in No. 88–856. With him on the briefs were *Barry G. Saretsky, Martin S. Kaufman, Michael J. Eng,* and *Aaron F. Fishbein. Anthony J. Mercorella, James L. Fischer, Vincent R. Fontana,* and *Vincent R. Cappucci* filed briefs for petitioner in No. 88–854. *William Greenberg* and *Joseph Maria* filed briefs for petitioners in No. 88–870. *Rex E. Lee, Carter G. Phillips, Mark D. Hopson, Stanley R. Strauss, Michael W. Sculnick,* and *Paul W. Pickelle* filed a brief for the city of Yonkers, respondent under this Court's Rule 12.4, in support of petitioners.

*Solicitor General Starr* argued the cause for respondents in all cases. With him on the brief for the United States were *Acting Assistant Attorney General Turner, Deputy Solicitor General Shapiro, Michael R. Lazerwitz, David K. Flynn,* and *Linda F. Thome. Grover G. Hankins* filed a brief for respondents Yonkers Branch—National Association for the Advancement of Colored People et al.[†]

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This action is the most recent episode of a lengthy lawsuit in which the city of Yonkers was held liable for intentionally enhancing racial segregation in housing in Yonkers. The issue here is whether it was a proper exercise of judicial power for the District Court to hold petitioners, four Yonkers city councilmembers, in contempt for refusing to vote in favor of legislation implementing a consent decree earlier approved by the city. We hold that in the circumstances of this action the District Court abused its discretion.

---

[†]*Steven R. Shapiro, Christopher A. Hansen, John A. Powell, Helen Hershkoff,* and *Arthur N. Eisenberg* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

*Henry Mark Holzer, Daniel J. Popeo,* and *Paul D. Kamenar* filed a brief for the Yonkers Federation, Inc., as *amicus curiae.*

## I

In 1980, the United States filed a complaint alleging, *inter alia*, that the two named defendants—the city of Yonkers and the Yonkers Community Development Agency—had intentionally engaged in a pattern and practice of housing discrimination, in violation of Title VIII of the Civil Rights Act of 1968, 82 Stat. 81, as amended, 42 U. S. C. § 3601 *et seq.* (1982 ed.), and the Equal Protection Clause of the Fourteenth Amendment. The Government and plaintiff-intervenor National Association for the Advancement of Colored People (NAACP) asserted that the city had, over a period of three decades, selected sites for subsidized housing in order to perpetuate residential racial segregation. The plaintiffs' theory was that the city had equated subsidized housing for families with minority housing, and thus disproportionately restricted new family housing projects to areas of the city—particularly southwest Yonkers—already predominately populated by minorities.

The District Court found the two named defendants liable, concluding that the segregative effect of the city's actions had been "consistent and extreme," and that "the desire to preserve existing patterns of segregation ha[d] been a significant factor in the sustained community opposition to subsidized housing in East Yonkers and other overwhelmingly white areas of the City." *United States* v. *Yonkers Bd. of Ed.*, 624 F. Supp. 1276, 1369–1371 (SDNY 1985). The District Court in its remedial decree enjoined "the City of Yonkers, its officers, agents, employees, successors and all persons in active concert or participation with any of them" from, *inter alia*, intentionally promoting racial residential segregation in Yonkers, taking any action intended to deny or make unavailable housing to any person on account of race or national origin, and from blocking or limiting the availability of public or subsidized housing in east or northwest Yonkers on the basis of race or national origin. *United States* v. *Yonkers Bd. of*

*Ed.*, 635 F. Supp. 1577 (SDNY 1986). Other parts of the remedial order were directed only to the city. They required affirmative steps to disperse public housing throughout Yonkers. Part IV of the order noted that the city previously had committed itself to provide acceptable sites for 200 units of public housing as a condition for receiving 1983 Community Development Block Grant funds from the Federal Government, but had failed to do so. Consequently, it required the city to designate sites for 200 units of public housing in east Yonkers, and to submit to the Department of Housing and Urban Development an acceptable Housing Assistance Plan for 1984–1985 and other documentation. *Id.*, at 1580–1581. Part VI directed the city to develop by November 1986 a long-term plan "for the creation of additional subsidized family housing units . . . in existing residential areas in east or northwest Yonkers." *Id.*, at 1582. The court did not mandate specific details of the plan such as how many subsidized units must be developed, where they should be constructed, or how the city should provide for the units.

Under the Charter of the city of Yonkers all legislative powers are vested in the city council, which consists of an elected mayor and six councilmembers, including petitioners. The city, for all practical purposes, therefore, acts through the city council when it comes to the enactment of legislation. Pending appeal of the District Court's liability and remedial orders, however, the city did not comply with Parts IV and VI of the remedial order. The city failed to propose sites for the public housing, and in November 1986, informed the District Court that it would not present a long-term plan in compliance with Part VI. The United States and the NAACP then moved for an adjudication of civil contempt and the imposition of coercive sanctions, but the District Court declined to take that action. Instead, it secured an agreement from the city to appoint an outside housing adviser to identify sites for the 200 units of public housing and to draft a long-term plan.

In December 1987, the Court of Appeals for the Second Circuit affirmed the District Court's judgment in all respects, *United States* v. *Yonkers Bd. of Ed.*, 837 F. 2d 1181, and we subsequently denied certiorari, *Yonkers Bd. of Ed.* v. *United States*, 486 U. S. 1055 (1988). Shortly after the Court of Appeals' decision, in January 1988, the parties agreed to a consent decree that set forth "certain actions which the City of Yonkers [would] take in connection with a consensual implementation of Parts IV and VI" of the housing remedy order. App. 216. The decree was approved by the city council in a 5-to-2 vote (petitioners Spallone and Chema voting no), and entered by the District Court as a consent judgment on January 28, 1988. Sections 12 through 18 of the decree established the framework for the long-term plan and are the underlying bases for the contempt orders at issue in this action.[1] Perhaps most significant was § 17, in which the city agreed to adopt, within 90 days, legislation conditioning the construction of all multifamily housing on the inclusion of at least 20 percent assisted units, granting tax abatements and density bonuses to developers, and providing for zoning changes to allow the placement of housing developments.[2]

---

[1] Sections 1 through 11 of the consent decree set forth actions that the city agreed to take in connection with the public housing obligations imposed by Part IV of the housing remedy order. As the Solicitor General emphasized at oral argument, neither those sections of the decree nor Part IV of the remedy order is at issue in this action.

[2] The full text of § 17 provides that "[t]he City agrees to adopt, among other things, legislation (a) conditioning the construction of all multifamily housing (inclusive of projects for future construction currently in the planning stage but which will require zoning changes, variances, special exceptions, or other discretionary approvals from the City to begin construction) on the inclusion of at least 20 percent assisted units; (b) granting necessary tax abatements to housing developments constructed under the terms of the legislation referred to in clause (a); (c) granting density bonuses to such developers; (d) providing for zoning changes to allow the placement of such developments, provided, however, that such changes are not substantially inconsistent with the character of the area; and (e) other provisions upon which the parties may subsequently agree (including the use of the In-

For several more months, however, the city continued to delay action toward implementing the long-term plan. The city was loath to enact the plan because it wished to exhaust its remedies on appeal, but it had not obtained any stay of the District Court's order. As a result of the city's intransigence, the United States and the NAACP moved the court for the entry of a Long Term Plan Order based on a draft that had been prepared by the city's lawyers during negotiations between January and April 1988. On June 13, following a hearing and changes in the draft, the District Court entered the Long Term Plan Order, which provided greater detail for the legislation prescribed by § 17 of the decree. After several weeks of further delay the court held a hearing on July 26, 1988, and entered an order requiring the city of Yonkers to enact, on or before August 1, 1988, the "legislative package" described in a section of the earlier consent decree; the second paragraph provided:

> "It is further ORDERED that, in the event the City of Yonkers fails to enact the legislative package on or before August 1, 1988, the City of Yonkers shall be required to show cause at a hearing before this Court at 10:00 a.m. on August 2, 1988, why it should not be held in contempt, and each individual City Council member shall be required to show cause at a hearing before this court at 10:00 a.m. on August 2, 1988, why he should not be held in contempt." App. 398.

Further provisions of the order specified escalating daily amounts of fines in the event of contempt, and provided that if the legislation were not enacted before August 10, 1988, any councilmember who remained in contempt should be committed to the custody of the United States Marshal for

dustrial Development Authority as a development vehicle and the creation of a municipally-designated, independent not-for-profit Local Development Corporation) (collectively, the 'Mandated Incentives'). The City agrees to implement a package of Mandated Incentives as promptly as practicable but, in no event, later than 90 days after the entry of this decree."

imprisonment. The specified daily fines for the city were $100 for the first day, to be doubled for each consecutive day of noncompliance; the specified daily fine for members of the city council was $500 per day.

Notwithstanding the threat of substantial sanctions, on August 1 the city council defeated a resolution of intent to adopt the legislative package, known as the Affordable Housing Ordinance, by a vote of 4 to 3 (petitioners constituting the majority). On August 2, the District Court held a hearing to afford the city and the councilmembers an opportunity to show cause why they should not be adjudicated in contempt. It rejected the city's arguments, held the city in contempt, and imposed the coercive sanctions set forth in the July 26 order. After questioning the individual councilmembers as to the reasons for their negative votes, the court also held each of the petitioners in contempt and imposed sanctions. It refused to accept the contention that the proper subject of the contempt sanctions was the city of Yonkers alone, see *id.*, at 461, and overruled the objection that the court lacked the power to direct councilmembers how to vote, because in light of the consent judgment, it thought the city council's adoption of the Affordable Housing Ordinance would be "in the nature of a ministerial act." *Id.*, at 460.

On August 9, the Court of Appeals stayed the contempt sanctions pending appeal. Shortly thereafter, the court affirmed the adjudications of contempt against both the city and the councilmembers, but limited the fines against the city so that they would not exceed $1 million per day. *United States* v. *Yonkers*, 856 F. 2d 444 (CA2 1988). The Court of Appeals refused to accept the councilmembers' argument that the District Court abused its discretion in selecting its method of enforcing the consent judgment. While recognizing that "a court is obliged to use the 'least possible power adequate to the end proposed,'" *id.* at 454 (quoting *Anderson* v. *Dunn*, 6 Wheat. 204, 231 (1821)), it concluded that the District Court's choice of coercive contempt sanctions against

the councilmembers could not be an abuse of discretion, because the city council had approved the consent judgment and thereby agreed to implement the legislation described in § 17 of the decree. The Court of Appeals also rejected petitioners' invocation of the federal common law of legislative immunity, see *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), concluding that "[w]hatever the scope of local legislators' immunity, it does not insulate them from compliance with a consent judgment to which their city has agreed and which has been approved by their legislative body." 856 F. 2d, at 457. Finally, the court held that even if "the act of voting has sufficient expressive content to be accorded some First Amendment protection as symbolic speech, the public interest in obtaining compliance with federal court judgments that remedy constitutional violations unquestionably justifies whatever burden on expression has occurred." *Ibid.*

Both the city and the councilmembers requested this Court to stay imposition of sanctions pending filing and disposition of petitions for certiorari. We granted a stay as to petitioners, but denied the city's request. 487 U. S. 1251 (1988). With the city's contempt sanction approaching $1 million per day, the city council finally enacted the Affordable Housing Ordinance on September 9, 1988, by a vote of 5 to 2, petitioners Spallone and Fagan voting no. Because the contempt orders raise important issues about the appropriate exercise of the federal judicial power against individual legislators, we granted certiorari, 489 U. S. 1064 (1989), and now reverse.

## II

The issue before us is relatively narrow. There can be no question about the liability of the city of Yonkers for racial discrimination: the District Court imposed such liability on the city, its decision was affirmed in all respects by the Court of Appeals, and we denied certiorari. Nor do we have before us any question as to the District Court's remedial order; the Court of Appeals found that it was within the bounds of

proper discretion, *United States* v. *Yonkers Bd. of Ed.*, 837 F. 2d, at 1236, and we denied certiorari. Our focus, then, is only on the District Court's order of July 26 imposing contempt sanctions on the individual petitioners if they failed to vote in favor of the ordinance in question.

Petitioners contend that the District Court's order violates their rights to freedom of speech under the First Amendment, and they also contend that they are entitled as legislators to absolute immunity for actions taken in discharge of their legislative responsibilities. We find it unnecessary to reach either of these questions, because we conclude that the portion of the District Court's order of July 26 imposing contempt sanctions against petitioners if they failed to vote in favor of the court-proposed ordinance was an abuse of discretion under traditional equitable principles.

Before discussing the principles informing our conclusion, it is important to note the posture of the case before the District Court at the time it entered the order in question. Petitioners were members of the city council of the city of Yonkers, and if the city were to enact legislation it would have to be by their doing. But petitioners had never been made parties to the action, and the District Court's order imposed liability only on the named defendants in the action—the city of Yonkers and the Yonkers Community Development Agency. The remedial order had enjoined the two named defendants, and—in the traditional language of a prohibitory decree—officers, agents, and others acting in concert with them from discriminating on the basis of race in connection with the furnishing of housing and from intentionally promoting racial residential segregation in Yonkers. The order had gone on to require extensive affirmative steps to disperse public housing throughout Yonkers, but those portions of the order were directed only against the city. There was no evidence taken at the hearing of July 26, 1988, and the court's order of that date did not make petitioners parties to the action.

From the time of the entry of the remedial order in early 1986 until this Court denied certiorari in the case involving the merits of the litigation in June 1988, the city backed and filled in response to the court's efforts to obtain compliance with the housing portions of the decree. It agreed to a consent decree and then sought unsuccessfully to have the decree vacated. During this period of time the city had a certain amount of bargaining power simply by virtue of the length of time it took the appellate process to run its course. Although the judgment against the city was not stayed, the District Court was sensibly interested in moving as rapidly as possible toward the construction of housing which would satisfy the remedial order, rather than simply forcing the city to enact legislation. The District Court realized that for such construction to begin pursuant to the remedial decree, not only must the city comply, but potential builders and developers must be willing to put up money for the construction. To the extent that the city took action voluntarily, without threatening to rescind the action if the District Court's decision were reversed, construction could proceed before the appellate process had run its course.

All of this changed, however, in June 1988, when this Court denied certiorari and the District Court's orders on the merits of the case became final. On July 26, the court heard the comments of counsel for the parties and entered the order upon which the contempt sanctions against the individual councilmembers were based.

At this stage of the case, the court contemplated various methods by which to ensure compliance with its remedial orders. It considered proceeding under Federal Rule of Civil Procedure 70, whereby a party who is ordered to perform an act but fails to do so is nonetheless "deemed" to have performed it. It also suggested the possible transference of functions relating to housing from the city council to a court-appointed affordable housing commission; the city opposed this method. Finally, it considered proceeding by way of

sanctions for contempt to procure the enactment of the ordinance.

In selecting a means to enforce the consent judgment, the District Court was entitled to rely on the axiom that "courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani* v. *United States*, 384 U. S. 364, 370 (1966). When a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers. See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 15 (1971). But while "remedial powers of an equity court must be adequate to the task, . . . they are not unlimited." *Whitcomb* v. *Chavis*, 403 U. S. 124, 161 (1971). "[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken* v. *Bradley*, 433 U. S. 267, 280–281 (1977). And the use of the contempt power places an additional limitation on a district court's discretion, for as the Court of Appeals recognized, "in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'" 856 F. 2d, at 454 (quoting *Anderson* v. *Dunn*, 6 Wheat., at 231).

Given that the city had entered a consent judgment committing itself to enact legislation implementing the long-term plan, we certainly cannot say it was an abuse of discretion for the District Court to have chosen contempt sanctions against the city, as opposed to petitioners, as a means of ensuring compliance. The city, as we have noted, was a party to the action from the beginning, had been found liable for numerous statutory and constitutional violations, and had been subjected to various elaborate remedial decrees which had been upheld on appeal. Petitioners, the individual city councilmembers, on the other hand, were not parties to the action, and they had not been found individually liable for any of the violations upon which the remedial decree was based. Although the injunctive portion of that decree was directed

not only to the city but to "its officers, agents, employees, successors and all persons in active concert or participation with any of them," App. 20, the remaining parts of the decree ordering affirmative steps were directed only to the city.[3]

It was the city, in fact, which capitulated. After the Court of Appeals had briefly stayed the imposition of sanctions in August, and we granted a stay as to petitioners but denied it to the city in September, the city council on September 9, 1988, finally enacted the Affordable Housing Ordinance by a vote of 5 to 2. While the District Court could not have been sure in late July that this would be the result, the city's arguments against imposing sanctions on it pointed out the sort of pressure that such sanctions would place on the city. After just two weeks of fines, the city's emergency financial plan required it to curtail sanitation services (resulting in uncollected garbage), eliminate part-time school crossing guards, close all public libraries and parks, and lay off approximately 447 employees. In the ensuing four weeks, the city would have been forced to lay off another 1,100 city employees. See N. Y. Times, Sept. 8, 1988, p. A1, col. 4; N. Y. Times, Sept. 9, 1988, p. A1, col. 4.

Only eight months earlier, the District Court had secured compliance with an important remedial order through the threat of bankrupting fines against the city alone. After the city had delayed for several months the adoption of a 1987–1988 Housing Assistance Plan (HAP) vital to the public housing required by Part IV of the remedial order, the court ordered the city to carry out its obligation within two days. App. 176. The court set a schedule of contempt fines equal to that assessed for violation of the orders in this litigation and recognized that the consequence would be imminent bankruptcy for the city. *Id.*, at 177–179. Later *the same day*, the city council agreed to support a resolution putting in place an effective HAP and reaffirming the commitment of

---

[3] The Government's statement to the contrary in its brief, Brief for United States 23–24, is in error.

Yonkers to accept funds to build the 200 units of public housing mandated by Part IV of the remedial order. *Id.*, at 183.[4]

The nub of the matter, then, is whether in the light of the reasonable probability that sanctions against the city would accomplish the desired result, it was within the court's discretion to impose sanctions on petitioners as well under the circumstances of this case.

In *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), we held that state legislators were absolutely privileged in their legislative acts in an action against them for damages. We applied this same doctrine of legislative immunity to regional legislatures in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 404–405 (1979), and to actions for both damages and injunctive relief in *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.*, 446 U. S. 719, 731–734 (1980). The holdings in these cases do not control the question whether local legislators such as petitioners should be immune from contempt sanctions imposed for failure to vote in favor of a particular legislative bill. But some of the same considerations on which the immunity doctrine is based must inform the District Court's exercise of its discretion in a case such as this. "Freedom of speech and action in the legislature," we observed, "was taken as a matter of course by those who sev-

---

[4] The Government distinguishes the instant sanctions from those threatened in January 1988, because in this litigation the city and the city council had indicated by the defeat of a resolution proposed by the court that it "would not 'voluntarily adopt the legislation contemplated by the [court's orders].'" *Id.*, at 45 (quoting City of Yonkers Memorandum of Law in Opposition to Plaintiffs' Proposed Contempt Order; see App. 351). Before the court threatened sanctions for refusal to adopt the 1987–1988 HAP, however, the city council had twice tabled an initiative to enact the HAP, *id.*, at 173, and the court previously had been forced to "deem" HAP's to have been submitted for two previous years. *Id.*, at 174; Brief for United States 5, n. 7. Suffice it to say that the council's conduct with regard to the HAP hardly suggested a willingness to comply "voluntarily."

ered the Colonies from the Crown and founded our Nation." *Tenney, supra,* at 372.

In perhaps the earliest American case to consider the import of the legislative privilege, the Supreme Judicial Court of Massachusetts, interpreting a provision of the Massachusetts Constitution granting the rights of freedom of speech and debate to state legislators, recognized that "the privilege secured by it is not so much the privilege of the house as an organized body, *as of each individual member composing it, who is entitled to this privilege, even against the declared will of the house.* For he does not hold this privilege at the pleasure of the house; but derives it from the will of the people . . . ." *Coffin* v. *Coffin,* 4 Mass. 1, 27 (1808). This theme underlies our cases interpreting the Speech or Debate Clause and the federal common law of legislative immunity, where we have emphasized that any restriction on a legislator's freedom undermines the "public good" by interfering with the rights of the people to representation in the democratic process. *Lake Country Estates, supra,* at 404–405; *Tenney, supra,* at 377. The District Court was quite sensitive to this fact; it observed:

> "I know of no parallel for a court to say to an elected official, 'You are in contempt of court and subject to personal fines and may eventually be subject to personal imprisonment because of a manner in which you cast a vote.' I find that extraordinary." App. 433.

Sanctions directed against the city for failure to take actions such as those required by the consent decree coerce the city legislators and, of course, restrict the freedom of those legislators to act in accordance with their current view of the city's best interests. But we believe there are significant differences between the two types of fines. The imposition of sanctions on individual legislators is designed to cause them to vote, not with a view to the interest of their constituents or of the city, but with a view solely to their own personal interests. Even though an individual legislator took

the extreme position—or felt that his constituents took the extreme position—that even a huge fine against the city was preferable to enacting the Affordable Housing Ordinance, monetary sanctions against him individually would motivate him to vote to enact the ordinance simply because he did not want to be out of pocket financially. Such fines thus encourage legislators, in effect, to declare that they favor an ordinance not in order to avoid bankrupting the city for which they legislate, but in order to avoid bankrupting themselves.

This sort of individual sanction effects a much greater perversion of the normal legislative process than does the imposition of sanctions on the city for the failure of these same legislators to enact an ordinance. In that case, the legislator is only encouraged to vote in favor of an ordinance that he would not otherwise favor by reason of the adverse sanctions imposed on the city. A councilman who felt that his constituents would rather have the city enact the Affordable Housing Ordinance than pay a "bankrupting fine" would be motivated to vote in favor of such an ordinance because the sanctions were a threat to the fiscal solvency of the city for whose welfare he was in part responsible. This is the sort of calculus in which legislators engage regularly.

We hold that the District Court, in view of the "extraordinary" nature of the imposition of sanctions against the individual councilmembers, should have proceeded with such contempt sanctions first against the city alone in order to secure compliance with the remedial order. Only if that approach failed to produce compliance within a reasonable time should the question of imposing contempt sanctions against petitioners even have been considered. "This limitation accords with the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed.' *Anderson* v. *Dunn,* 6 Wheat. 204, 231 (1821); *In re Michael,* 326 U. S. 224, 227 (1945)." *Shillitani* v. *United States,* 384 U. S., at 371.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUS-
TICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

I understand and appreciate the Court's concern about the
District Court's decision to impose contempt sanctions against
local officials acting in a legislative capacity. We must all
hope that no court will ever again face the open and sustained
official defiance of established constitutional values and valid
judicial orders that prompted Judge Sand's invocation of the
contempt power in this manner. But I firmly believe that its
availability for such use, in extreme circumstances, is essen-
tial. As the District Court was aware:

> "The issues transcend Yonkers. They go to the very
> foundation of the system of constitutional government.
> If Yonkers can defy the orders of a federal court in any
> case, but especially a civil rights case, because compli-
> ance is unpopular, and if that situation is tolerated, then
> our constitutional system of government fails. The is-
> sues before the court this morning are no less significant
> than that." App. 177.

The Court today recognizes that it was appropriate for
the District Court to hold in contempt and fine the city of
Yonkers to encourage the city councilmembers to comply
with their prior promise to redress the city's history of ra-
cial segregation. Yet the Court also reprimands the Dis-
trict Court for simultaneously fining the individual council-
members whose continuing defiance was the true source of
the impasse, holding that personal sanctions should have
been considered only after the city sanctions first proved
fruitless.

I cannot accept this parsimonious view of the District
Court's discretion to wield the power of contempt. Judge
Sand's intimate contact for many years with the recalcitrant
councilmembers and his familiarity with the city's political cli-
mate gave him special insight into the best way to coerce
compliance when all cooperative efforts had failed. From

our detached vantage point, we can hardly judge as well as he which coercive sanctions or combination thereof were most likely to work quickly and least disruptively. Because the Court's *ex post* rationalization of what Judge Sand should have done fails to do justice either to the facts of this case or the art of judging, I must dissent.

I

For the past four decades, Yonkers officials have relentlessly preserved and exacerbated racial residential segregation throughout the city. The population of black and Hispanic residents grew from 3% in 1940 to 19% in 1980. Over 80% now reside in Yonkers' southwest section, and this channeling did not happen by chance. Starting in 1949, city officials initiated a series of low-income housing projects designed to serve the housing needs of this growing population; but city officials concentrated 96.6% of these projects in or adjacent to the southwest section, preserving east and northwest Yonkers as overwhelmingly white communities.[1] At the same time, city officials manipulated the public school

---

[1] According to the 1980 census, only 6% of the residents outside of southwest Yonkers were minorities, and they were largely concentrated in two small neighborhoods. One northwest neighborhood had a minority population of 29% and abutted a southwest tract comprised of over 50% minorities. The second neighborhood, located in east Yonkers, was Runyon Heights. This neighborhood was founded early in this century on a large tract of land by a state senator who regularly brought busloads of blacks from Harlem for picnics at which he auctioned off parcels of land to them. Runyon Heights is bounded to the north by a white neighborhood called Homefield. The original deeds for many Homefield properties contained restrictive covenants prohibiting the sale of such properties to minorities, and as Runyon Heights developed, the Homefield Neighborhood Association purchased and maintained a 4-foot strip of land as a barrier between the streets of the two neighborhoods. Most Runyon Heights streets terminate in a dead end just below this strip, essentially sealing off the minority community from the surrounding white neighborhood.

One of the only two low-income housing developments located outside of southwest Yonkers was placed in Runyon Heights. The other housed only senior citizens, predominantly whites.

system—*e. g.*, altering attendance zone boundaries, opening and closing schools, assigning faculty and administrators to schools based on race—creating and maintaining racially segregated schools, with the predominantly minority schools being educationally inferior.

Respondent United States brought suit in the United States District Court for the Southern District of New York to challenge these racially discriminatory practices, and respondent NAACP intervened. After a 14-month trial, Judge Sand took 277 pages to detail the myriad of racially motivated government acts and omissions and held the city of Yonkers and various agencies liable for intentional racial segregation in both housing and public education. *United States* v. *Yonkers Board of Education*, 624 F. Supp. 1276 (1985). With respect to the housing issue, Judge Sand found a "remarkably consistent and extreme" pattern of segregationist efforts "characterized by a common theme: racially influenced opposition to subsidized housing in certain [predominantly white] areas of the City, and acquiescence in that opposition by City officials." *Id.*, at 1369, 1370. Because "the operation of the City's ward system provided strong incentive for individual councilmen to defer to the views of their constituents on subsidized housing, and for the Council as a whole to defer to the views of the ward councilman," *id.*, at 1369, the council routinely designed its housing policies to give effect to its white constituents' ardent insistence on residential purity. Judge Sand summed up his extensive factual findings as follows:

> "In short, we find the unusual scope and complexity of plaintiffs' contentions to be matched by evidence of discriminatory intent that is itself unusual in its strength and abundance. Having considered the evidence in its entirety, this Court is fully persuaded that the extreme concentration of subsidized housing that exists in Southwest Yonkers today is the result of a pattern and practice of racial discrimination by City officials, pursued in

response to constituent pressures to select or support only sites that would preserve existing patterns of racial segregation, and to reject or oppose sites that would threaten existing patterns of segregation. This pattern of discriminatory actions is evident as early as the first selection of sites for public housing under the National Housing Act of 1949, and it has continued, unbroken, through . . . 1982." *Id.*, at 1373.

After conducting a 6-day hearing to determine appropriate remedies, Judge Sand issued on May 28, 1986, a Housing Remedy Order that required the city to facilitate the development of public and subsidized housing outside southwest Yonkers. *United States* v. *Yonkers Board of Education*, 635 F. Supp. 1577 (SDNY). The order required construction of 200 units of public housing; the city was required to propose sites for 140 units within 30 days and sites for the remaining 60 units within 90 days. The order also required the city to provide additional units of subsidized housing in east or northwest Yonkers, leaving the city broad discretion to choose the precise number and location of these subsidized units. The city was given aproximately six months to present for court approval a detailed long-term plan specifying, among other things, the number of subsidized units to be constructed or acquired, their location, and the rent levels or degree of subsidization.

Although these requirements were not stayed pending appeal, the city immediately defaulted on its obligations. Officials proposed no sites for the 200 units of public housing within the specified 30 and 90 days, and they failed to present a long-term plan for subsidized housing within six months. Indeed, city officials pointedly told Judge Sand that they would not comply with these aspects of the Housing Remedy Order. Respondents moved for an adjudication of civil contempt and the imposition of coercive sanctions. Judge Sand denied this motion, instead negotiating with the city for appointment of an outside housing adviser to help the city iden-

tify sites for the 200 units of public housing and to begin drafting a proposed long-term plan for the additional subsidized units.

The adviser recommended eight available sites for housing. The city council responded by passing a resolution conditioning its support for the adviser's general plan on a number of terms drastically limiting the scope and efficacy of the remedy, including (1) staying all construction until the city had exhausted all appeals; (2) reducing the units of subsidized housing from 800 to 200; and (3) allowing local residential committees to screen all applicants for public housing. The city then proposed that the Housing Remedy Order be modified in accordance with the city council's resolution. Judge Sand offered to consider the city's motion, explaining that he believed it appropriate to implement a remedy "embody[ing] to the maximum possible extent consistent with the purposes of the housing remedy order the views of the community itself." App. 87. To ensure that the city's proposal was not merely intended as a dilatory tactic, however, Judge Sand asked the city council to demonstrate its good faith by taking the preliminary steps necessary to obtain control of the potential housing sites identified by the housing adviser by, for example, passing a resolution requesting a neighboring county to permit the city to use identified county sites for housing.

But the city council neither passed the suggested resolution nor took any other action to obtain the proposed sites. The city's attorney informed Judge Sand that the city was still trying to devise a politically acceptable plan, but the attorney could not assure the judge that the plan, or any other action by the city council, would be forthcoming. During the remainder of 1987, the parties bickered over the selection of various sites to be used for construction of the 200 promised public units, and city officials still refused to propose a long-term plan.

On December 28, 1987, the Court of Appeals for the Second Circuit affirmed both Judge Sand's liability and remedy rulings with respect to both the housing discrimination and school segregation claims. In so doing, the court rejected as "frivolous" the city's challenge to Judge Sand's finding that the city officials' subsidized housing decisions were made with a "segregative purpose." *United States* v. *Yonkers Board of Education*, 837 F. 2d 1181, 1222, cert. denied, 486 U. S. 1055 (1988). The next month, the city indicated to Judge Sand that the parties had started negotiating an agreement designed to implement the Housing Remedy Order. On January 25, 1988, the parties informed the court that they had reached an agreement in principle. The Yonkers City Council approved the agreement by a 5-to-2 vote on January 27, with petitioners Chema and Spallone dissenting. Judge Sand entered the agreement, the "First Remedial Consent Decree in Equity" (Consent Decree), as a consent judgment the next day. The Consent Decree reiterated the city's pledge to build the 200 required public units, identified seven sites, and committed the city to a specific construction timetable. The city also promised to forgo any further judicial review of this aspect of the remedial order.

The Consent Decree also set a goal of 800 units of subsidized housing to be developed over four years in conjunction with market-rate housing developments, and it committed the city to specific actions needed to encourage private developers to build such housing. In §17 of the Consent Decree, the city expressly agreed to adopt legislation (referred to as the Affordable Housing Ordinance) conditioning the future construction of multifamily housing in Yonkers on the inclusion of at least 20% subsidized units, and providing for such private development incentives as zoning changes, tax abatements, and density bonuses. The city expressly agreed to enact this legislation within 90 days after entry of the Consent Decree. Section 18 of the Consent Decree provided that the city would negotiate further to resolve certain "sub-

sidiary issues" with respect to the long-term plan and would submit a second consent decree to be entered within three weeks.

Rather than abide by the terms of the Consent Decree, the city councilmembers sought almost immediately to disavow it. First, citing intense community opposition to the plan, the city moved to delete the provision forgoing judicial review of its obligation to build the 200 units, and the city even offered to return approximately $30 million in grants previously provided by the Federal Government to fund its low-income housing programs if this Court ultimately were to set aside the city's duty to encourage the long-term development of subsidized housing in white neighborhoods. After Judge Sand denied the motion, the city promptly informed him that it would not enact the legislation it had earlier approved in §17 of the Decree and it was "not interested" in completing negotiations on the long-term plan as required by §18. Finally, the city moved to vacate the Consent Decree *in toto*, arguing that the city's failure to secure permission of the Archdiocese of New York for using some seminary property as a housing site constituted a "mutual mistake" invalidating the entire agreement. Judge Sand denied this motion, "a transparent ploy . . . to avoid any responsibility for the court decree or implementation of the housing remedy order." App. 275.

In response to the city's recalcitrance, respondents moved for entry of a Long Term Plan Order based upon a draft piece of legislation that had recently been prepared by the city's attorneys and housing consultants. On June 13, following comments from the city, revisions by respondents, and an evidentiary hearing, Judge Sand entered a Long Term Plan Order which, accommodating the city's concerns, provided the details of the Affordable Housing Ordinance that the city council was required to enact pursuant to the Consent Decree. On the same day, this Court denied the city's petition for writ of certiorari to review the original finding of liabil-

ity and the Housing Remedy Order. *Yonkers Board of Education* v. *United States*, 486 U. S. 1055 (1988).

The next day, the city council unanimously passed a resolution declaring a moratorium on all public housing construction in Yonkers, in unabashed defiance of the Housing Remedy Order, Consent Decree, and Long Term Plan Order. Nearly two months after the deadline set in the Consent Decree for the city's enactment of the necessary implementing legislation, the city council informed Judge Sand through the city attorney that it would not consider taking any legislative action until August at the earliest.

In light of the city's renewed defiance, Judge Sand sought assurance of the city's basic commitment to comply. He orally requested the city council to pass a resolution endorsing the provisions of the Consent Decree and the Long Term Plan Order, with enactment of the Affordable Housing Ordinance to follow after the city fine-tuned some final aspects. The city council responded by defeating a resolution that would have required it to honor its previous commitments.[2]

Respondents then submitted a proposed order setting a timetable for the city's enactment of the promised Affordable Housing Ordinance, under penalty of contempt. The city baldly responded that it would "not voluntarily adopt the legislation contemplated by" the Consent Decree and the Long Term Plan Order. Thereafter, Judge Sand entered an order (Contempt Order) directing the city to enact by August 1 the Affordable Housing Ordinance that had been drafted by the city's consultants to implement the Consent Decree and the Long Term Plan Order. The Contempt Order specified that if the Housing Ordinance were not timely enacted, the city and city councilmembers would face contempt adjudication and the following sanctions: the city would be fined $100 for the first day and the amount would double each day of noncompliance thereafter; and the councilmembers voting

---

[2] The vote was 5 to 1; all four petitioners were in the majority.

against the legislation would be fined $500 per day and incarcerated after 10 days of continued defiance.  Then, to accommodate the city council's expressed concern that it could not adopt legislation by August 1 without running afoul of state notice and hearing requirements applicable to zoning changes, Judge Sand relaxed the Contempt Order's original mandate and stated that the Contempt Order would be considered satisfied if the council merely adopted a resolution committing the city to enact the Affordable Housing Ordinance after the state notice requirements had been met.

On August 1, the city council defeated such a resolution by a 4-to-3 vote.  Finding this defeat "but the latest of a series of contempts," App. 416, Judge Sand held the city and each of the councilmembers who voted against the resolution in civil contempt and imposed the coercive sanctions specified in the Contempt Order.

On August 9, the Court of Appeals for the Second Circuit granted a stay of these contempt sanctions.  On August 26, the court affirmed the contempt adjudications against both the city and petitioners but limited the city's escalating fines to an eventual ceiling of $1 million per day.  The court concluded that neither the city nor petitioners could escape responsibility for refusing to comply with the Consent Decree that the council itself had approved.  The court stayed issuance of its mandate, however, to permit application to this Court for a stay pending the filing of petitions for a writ of certiorari.  We granted a stay of the contempt sanctions against the individual councilmembers on September 1, but we denied the city's application for a similar stay.  *City of Yonkers* v. *United States*, 487 U. S. 1251 (1988).  A week later, the city council finally enacted the Affordable Housing Ordinance, over the dissenting votes of petitioners Spallone and Fagan.[3]

---

[3] While this vote terminated the contempt sanctions, it by no means heralded a lasting commitment on the part of the city council actually to follow through on the remedial obligations imposed by the Affordable Housing

## II

The Court today holds that Judge Sand acted within his discretion when he held in contempt and fined the city in an effort to coerce the city council to enact the legislation required by the Consent Decree. *Ante,* at 276. The Court holds, however, that Judge Sand's decision to assess personal fines against the individual councilmembers directly responsible for engineering and implementing the city's defiance constituted an abuse of discretion. Judge Sand should have considered personal sanctions, the Court believes, only if the city sanctions "failed to produce compliance within a reasonable time." *Ante,* at 280.

The Court's disfavor of personal sanctions rests on two premises: (1) Judge Sand should have known when he issued the Contempt Order that there was a "reasonable probability that sanctions against the city [alone] would accomplish the desired result," *ante,* at 278; and (2) imposing personal fines "effects a much greater perversion of the normal legislative process than does the imposition of sanctions on the city." *Ante,* at 280. Because personal fines were both completely superfluous to, and more intrusive than, sanctions against the city alone, the Court reasons, the personal fines constituted an abuse of discretion. Each of these premises is mistaken.

---

Ordinance. Since this date, no new public housing has been built in Yonkers. During the local city council election last November, petitioner Spallone "campaigned [for Mayor] on a pledge to continue the city's resistance to a Federal desegregation order requiring it to build low-income housing in white neighborhoods," N. Y. Times, Nov. 8, 1989, p. B1, col. 5, and Spallone was elected in a "race [that] was widely seen as a referendum on the housing desegregation plan." *Ibid.* Petitioners Chema and Fagan were reelected to the council, and the new member filling Spallone's vacated seat also opposes compliance; thus "candidates opposed to the housing plan appea[r] to hold a majority." *Ibid.* Whether Yonkers officials will *ever* comply with Judge Sand's orders attempting to remedy Yonkers' longstanding racial segregation remains an open question.

## A

While acknowledging that Judge Sand "could not have been sure in late July that this would be the result," *ante*, at 277, the Court confidently concludes that Judge Sand should have been *sure enough* that fining the city would eventually coerce compliance that he should not have personally fined the councilmembers as well. In light of the information available to Judge Sand in July, the Court's confidence is chimerical. Although the escalating city fines eventually would have seriously disrupted many public services and employment, *ibid.*, the Court's failure even to consider the possibility that the councilmembers would maintain their defiant posture despite the threat of fiscal insolvency bespeaks an ignorance of Yonkers' history of entrenched discrimination and an indifference to Yonkers' political reality.

The Court first fails to adhere today to our longstanding recognition that the "district court has firsthand experience with the parties and is best qualified to deal with the 'flinty, intractable realities of day-to-day implementation of constitutional commands.'" *United States* v. *Paradise*, 480 U. S. 149, 184 (1987) (quoting *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 6 (1971)).[4] Deference to the court's exercise of discretion is particularly appropriate where, as here, the record clearly reveals that the court employed extreme caution before taking the final step of holding the councilmembers personally in contempt. Judge Sand patiently weathered a whirlwind of evasive maneuvers and mis-

---

[4] See also, *e. g.*, *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 486 (1986) (Powell, J., concurring) (District Court, "having had the parties before it over a period of time, was in the best position to judge whether an alternative remedy . . . would have been effective in ending petitioners' discriminatory practices"); *Fullilove* v. *Klutznick*, 448 U. S. 448, 508 (1980) (Powell, J., concurring) (Court has "recognized that the choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court'") (quoting *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 794 (1976) (Powell, J., concurring in part and dissenting in part)).

representions, see *supra*, at 284–289; considered and rejected alternative means of securing compliance other than contempt sanctions;[5] and carefully considered the ramifications of personal fines.   In the end, he readily acknowledged:

> "I know of no parallel for a court to say to an elected official: 'You are in contempt of court and subject to personal fines and may eventually be subject to personal imprisonment because of a manner in which you cast a vote.'   I find that extraordinary.
>
> "I find it so extraordinary that at great cost in terms of time and in terms of money and energy and implementation of court's orders, I have sought alternatives to that. But they have all been unsuccessful. . . ."   App. 433.

After according no weight to Judge Sand's cautious and contextual judgment despite his vastly superior vantage

---

[5] Judge Sand considered but ultimately discarded two alternatives: (1) vesting all of the city's legislative and executive power with respect to housing development in a judicially created affordable housing commission; and (2) "deeming" by judicial decree the Affordable Housing Ordinance to have been enacted and enjoining Yonkers' executive officials to comply with the ordinance despite its lack of legislative support.   See *ante*, at 275.   I agree with the Court that, given city council approval of the city's Consent Decree committing itself to pass legislation implementing the Housing Remedy Order, Judge Sand did not abuse his discretion by binding the city to its own commitment.   *Ante*, at 276.   Moreover, the city repeatedly objected to creation of an independent affordable housing commission, and because this remedy would have completely divested the council of all legislative power in the housing field, it is difficult to characterize it as a less intrusive means of remedying the discrimination. Finally, "deeming" the Affordable Housing Ordinance to have been passed likely would have been less effective in the long run.   Judge Sand would have still faced a continuing compliance battle with the city council; as he observed, "[o]bviously, if the city council were to say, well, Judge Sand, those are your orders ["deeming" the Ordinance enacted], you do with them what you will but at some point we will reassert our authority, then we are engaged in an exercise which doesn't get housing built."   App. 357. Moreover, private developers would have been less likely to commit resources to the subsidized housing program absent an assurance of ongoing council support for the program evidenced by council resolution.

point, the Court compounds its error by committing two more. First, the Court turns a blind eye to most of the evidence available to Judge Sand suggesting that, because of the councilmembers' continuing intransigence, sanctions against the city alone might not coerce compliance and that personal sanctions would significantly increase the chance of success. Second, the Court fails to acknowledge that supplementing city sanctions with personal ones likely would secure compliance more promptly, minimizing the overall disruptive effect of the city sanctions on city services generally and long-term compliance with the Consent Decree in particular.

As the events leading up to the Contempt Order make clear, the recalcitrant councilmembers were extremely responsive to the strong segments of their constituencies that were vociferously opposed to racial residential integration. Councilmember Fagan, for example, explained that his vote against the Affordable Housing Ordinance required by the Consent Decree "was an act of defiance. The people clearly wanted me to say no to the judge." *Id.*, at 426. Councilmember Spallone declared openly that "I will be taking on the judge all the way down the line. I made a commitment to my people and that commitment remains." *Id.*, at 457–458. Moreover, once Yonkers had gained national attention over its refusal to integrate, many residents made it clear to their representatives on the council that they preferred bankrupt martyrdom to integration. As a contemporaneous article observed, "[t]he defiant Councilmen are riding a wave of resentment among their white constituents that is so intense that many insist they are willing to see the city bankrupted . . . ." N. Y. Times, Aug. 5, 1988, p. B2, col. 4. It thus was not evident that petitioners opposed bankrupting the city; at the very least, capitulation by any individual councilmember was widely perceived as political suicide. As a result, even assuming that each recalcitrant member sought to avoid city bankruptcy, each still had a very strong incentive to play "chicken" with his colleagues by continuing to defy the Con-

tempt Order while secretly hoping that at least one colleague would change his position and suffer the wrath of the electorate. As Judge Sand observed, "[w]hat we have here is competition to see who can attract the greatest notoriety, who will be the political martyr . . . *without regard to what is in the best interests of the City of Yonkers.*" App. 409 (emphasis added).

Moreover, acutely aware of these political conditions, the city attorney repeatedly warned Judge Sand *not* to assume that the threat of bankruptcy would compel compliance. See, *e. g., id.,* at 410 (threatening to bankrupt city "punishes the innocent" but "doesn't necessarily coerce compliance by the council members"); *id.,* at 415 (bankrupting Yonkers "is indeed an unfortunate result that may obtain and that is exactly why we are urging that the city not be fined itself"). See also City of Yonkers' Reply Memorandum of Law in Support of Stay of Contempt Sanctions in No. 88–6178 (CA2), pp. 9–10 (city argued that "in the context of a media spectacle surrounding the defiance of the Councilmembers of the District Court's Order . . . there is little hope of avoiding municipal bankruptcy in the hopes that the individual Councilmembers will change their vote in the near future. This Court should not rely on the hope that the individual Councilmembers will rescue the City from bankruptcy").[6] The clearest warning that the risk of insolvency might not motivate capitulation came at the contempt hearing on August 2. The city proposed that its fines be stayed until August 15 so the council could hold a public hearing and that if the council had failed to adopt the required Affordable Housing Ordinance at that time, the fines would resume as compounded for the intervening time period, meaning the city would owe over $3.2 million the very next day, and over $104 million by the end of the week. After listening to this proposal, Judge Sand asked the city attorney:

---

[6] Memorandum filed with the Court of Appeals for the Second Circuit six days after Judge Sand held the city and petitioners in contempt.

"Mr. Sculnick, seated behind you are all of the members of the city council of Yonkers. Are you making a good faith representation to the court that if such a stay were granted, you have reason to believe that on August 15th, the ordinance would be passed? Are you making such a representation?" App. 418.

Despite the fact that such an enormous liability would soon trigger bankruptcy, the city attorney replied:

"No, your Honor, I don't have the factual basis for making that statement."[7] *Ibid.*

Even if one uncharitably infers in hindsight that the city attorney was merely posturing, given the extremely high stakes I cannot agree with the Court's implicit suggestion that Judge Sand was required to call the city's bluff.

The Court's opinion ignores this political reality surrounding the events of July 1988 and instead focuses exclusively on the fact that, eight months earlier, Judge Sand had secured compliance with another remedial order through the threat of city sanctions alone. *Ante,* at 277–278. But this remedial order had required only that the city council adopt a 1987–1988 Housing Assistance Plan, a prerequisite to the city's qualification for federal housing subsidies. In essence, Judge Sand had to threaten the city with contempt fines just to convince the council to *accept* over $10 million in federal funds.

---

[7] The same clear warning was provided to the Second Circuit. At its hearing on the city's stay application pending appeal, the court inquired whether the attorney had changed his mind and now had reason to believe that the threat of the accrued fines payable on August 15 would coerce compliance. The attorney replied as follows:

"No, I think that would be playing Russian roulette on the city's behalf. I couldn't in good conscience suggest this. I suggested it at the time because I hoped that because several council members had suggested that their concern was that they could not vote the zoning ordinance into effect without the prior notice and public hearing, that if we allowed them to vote on August 15th, that would get rid of that excuse. But *I have no reasonable belief that council members would change their vote.*" Tr. 13 (Aug. 9, 1988) (emphasis added).

Moreover, the city council capitulated by promising merely to accept the funds—any implied suggestion that it ever intended to *use* the money for housing was, of course, proved false by subsequent events. Indeed, a mere two months later, the city council offered to *return* approximately $30 million in federal funds in the event that this Court ultimately set aside the public housing provisions of the Housing Remedy Order. See *supra*, at 287. At this point, Judge Sand found that the city council had "crossed the line of any form of fiscal or other governmental responsibility." App. 409.

Moreover, any confidence that city sanctions alone would ever work again was eroded even further by the public outcry against the council's approval of the Consent Decree, which magnified the councilmembers' determination to defy future judicial orders. The council's post-Decree conduct represented renewed "efforts by the city council to extricate itself from the political consequences which it believes have resulted from its assuming any degree of responsibility in connection with implementation of the housing plan." *Id.*, at 272. Given the nature of the original contempt "success" and the heightened level of obstruction and recalcitrance thereafter, Judge Sand was justified in questioning whether the sanction of city fines alone would work again.

The Court, in addition to ignoring all of this evidence before concluding that city sanctions alone would eventually coerce compliance, also inexplicably ignores the fact that imposing personal fines in addition to sanctions against the city would not only help ensure but actually *hasten* compliance. City sanctions, by design, impede the normal operation of local government. Judge Sand knew that each day the councilmembers remained in contempt, the city would suffer an ever-growing financial drain that threatened not only to disrupt many critical city services but also to frustrate the long-term success of the underlying remedial scheme. Fines assessed against the public fisc directly "diminish the limited resources which the city has to comply with the Decree,"

*United States* v. *Providence*, 492 F. Supp. 602, 610 (RI 1980), and more generally curtail various public services with a likely disparate impact on poor and minority residents.

Given these ancillary effects of city sanctions, it seems to me entirely appropriate—indeed obligatory—for Judge Sand to have considered, not just whether city sanctions alone would *eventually* have coerced compliance, but also *how promptly* they would have done so. The Court's implicit conclusion that personal sanctions were redundant both exaggerates the likelihood that city sanctions alone would have worked at all, see *supra*, at 293–295, and also fails to give due weight to the importance of speed, because supplementing the city sanctions with personal sanctions certainly increased the odds for prompt success. At the very least, personal sanctions made political martyrdom a much more unattractive option for the councilmembers. In light of the tremendous stakes at issue, I cannot fault Judge Sand for deciding to err on the side of being safe rather than sorry.

In sum, the record does not support the Court's casual conclusion today that Judge Sand should have perceived a "reasonable probability that sanctions against the city [alone] would accomplish the desired result." *Ante*, at 278. Rather, the city councilmembers' vehement and unyielding defiance of Judge Sand's remedial orders, and his political acumen borne of eight years' firsthand experience with the Yonkers political environment, led him quite reasonably to believe that city sanctions alone would have induced compliance only slowly if at all and at great cost to the city and long-term remedial success, and that personal sanctions would enhance both the promptness and ultimate likelihood of compliance. Under these circumstances, Judge Sand's cautious exercise of contempt power was within the permissible bounds of his remedial discretion. The Court's determination to play district court-for-a-day—and to do so poorly—is indefensible.

## B

The Court purports to bolster its judgment by contending that personal sanctions against city councilmembers effect a greater interference than city sanctions with the "'interests of . . . local authorities in managing their own affairs, consistent with the Constitution.'" *Ante,* at 276 (quoting *Milliken* v. *Bradley,* 433 U. S. 267, 280–281 (1977)). Without holding today that the doctrine of absolute legislative immunity itself is applicable to local (as opposed to state and regional) legislative bodies, *ante,* at 278, the Court declares that the principle of legislative independence underlying this doctrine "must inform the District Court's exercise of its discretion in a case such as this." *Ibid.*

According to the Court, the principle of legislative independence does not preclude the District Court from attempting to coerce the city councilmembers into compliance with their promises contained in the Consent Decree. The Court acknowledges that "[s]anctions directed against the city for failure to take actions such as those required by the consent decree coerce the city legislators and, of course, restrict the freedom of those legislators to act in accordance with their current view of the city's best interests." *Ante,* at 279. Nevertheless, the Court contends, the imposition of personal sanctions as a means of coercion "effects a much greater perversion of the normal legislative process" than city sanctions, *ante,* at 280, and therefore the principle of legislative independence favors the use of personal sanctions only as a fallback position. *Ibid.*

The Court explains that personal sanctions are designed to encourage legislators to implement the remedial decree "in order to avoid bankrupting themselves," *ibid.,* a decision-making process in which the recalcitrant councilmembers weigh the public's interests against their own private interests — a process thought inappropriate when legislators exercise their duty to represent their constituents. In contrast, city sanctions are designed to encourage legislators to act

out of concern for their constituents' presumed interest in a fiscally solvent city, *ibid.*, a decisionmaking process in which the councilmembers merely weigh competing public interests — "the sort of calculus in which legislators engage regularly." *Ibid.* At bottom, then, the Court seems to suggest that personal sanctions constitute a "greater perversion of the normal legislative process" merely because they do not replicate that process' familiar mode of decisionmaking.

But the Court has never evinced an overriding concern for replicating the "normal" decisionmaking process when designing coercive sanctions for state and local executive officials who, like legislators, presumably are guided by their sense of public duty rather than private benefit. While recognizing that injunctions against such executive officials occasionally must be enforced by criminal or civil contempt sanctions of fines or imprisonment, see, *e. g.*, *Hutto* v. *Finney*, 437 U. S. 678, 690–691 (1978), we have never held that fining or even jailing these officials for contempt is categorically more intrusive than fining their governmental entity in order to coerce compliance indirectly. Indeed, as the author of today's majority opinion has written,

> "There is no reason for the federal courts to engage in speculation as to whether the imposition of a fine against the State is 'less intrusive' than 'sending high state officials to jail.' So long as the rights of the plaintiffs and the authority of the District Court are amply vindicated by an award of fees [akin to a contempt fine for bad-faith litigation in defiance of federal court decrees], it should be a matter of no concern to the court whether those fees are paid by state officials personally or by the State itself." *Id.*, at 716 (REHNQUIST, J., dissenting) (citation omitted).

Thus the Court's position necessarily presumes that a district court, while seeking to coerce compliance with a consent decree promising to implement a specific remedy for a constitu-

tional violation, must take far greater care to preserve the "normal legislative process" (balancing only public interests) for local legislators than it must take to preserve the normal and analogous decisionmaking process for executive officials. But the Court cannot fairly derive this premise from the principle underlying the doctrine of legislative immunity.

The doctrine of legislative immunity recognizes that, when acting collectively to pursue a vision of the public good through legislation, legislators must be free to represent their constituents "without fear of outside interference" that would result from private lawsuits. *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.*, 446 U. S. 719, 731 (1980). Of course, legislators are bound to respect the limits placed on their discretion by the Federal Constitution; they are duty bound not to enact laws they believe to be unconstitutional, and their laws will have no effect to the extent that courts believe them to be unconstitutional. But when acting "in the sphere of legitimate legislative activity," *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951)—*i. e.*, formulating and expressing their vision of the public good within self-defined constitutional boundaries—legislators are to be "immune from deterrents to the uninhibited discharge of their legislative duty." *Id.*, at 377. Private lawsuits threaten to chill robust representation by encouraging legislators to avoid controversial issues or stances in order to protect themselves " 'not only from the consequences of litigation's results but also from the burden of defending themselves.' " *Supreme Court of Virginia, supra*, at 732 (quoting *Dombrowski* v. *Eastland*, 387 U. S. 82, 85 (1967)).[8] To encourage legislators best to represent their constituents' interests, legislators must be afforded immunity from private suit.

---

[8] Cf. *Powell* v. *McCormack*, 395 U. S. 486, 503 (1969) ("[T]he legislative immunity created by the Speech or Debate Clause . . . insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation").

But once a federal court has issued a valid order to remedy the effects of a prior, specific constitutional violation, the representatives are no longer "acting in a field where legislators traditionally have power to act." *Tenney, supra,* at 379.[9] At this point, the Constitution itself imposes an overriding definition of the "public good," and a court's valid command to obey constitutional dictates is not subject to override by any countervailing preferences of the polity, no matter how widely and ardently shared. Local legislators, for example, may not frustrate valid remedial decrees merely because they or their constituents would rather allocate public funds for other uses.[10] More to the point here, legislators certainly may not defy court-ordered remedies for racial discrimination merely because their constituents prefer to maintain segregation: "'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.'" *Palmore* v. *Sidoti,*

---

[9] I do not mean to suggest that public policy concerns may play no role in designing the scope or content of the underlying remedial order. When each of a variety of different remedial programs would fully remedy the constitutional violation, for example, a district court should take into account relevant and important policy concerns voiced by government defendants in choosing among such remedies. Here, "[a]t every step of the proceedings, the [district] court has stayed its hand to enable the elected representatives of Yonkers to have the maximum input in shaping the destiny of Yonkers." App. 205.

[10] See, *e. g., Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 681 (1978) (observing historical practice of district courts' "ordering that taxes be levied and collected [by municipalities] to discharge federal-court judgments, once a constitutional infraction was found"); *Griffin* v. *Prince Edward County School Board,* 377 U. S. 218, 233 (1964) (district court could "require the [County] Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system . . ."); cf. *Watson* v. *Memphis,* 373 U. S. 526, 537 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them").

466 U. S. 429, 433 (1984) (quoting *Palmer* v. *Thompson*, 403
U. S. 217, 260–261 (1971) (WHITE, J., dissenting)). Defiance
at this stage results, in essence, in a perpetuation of the very
constitutional violation at which the remedy is aimed. See
*supra*, at 283–284.[11] Hence, once Judge Sand found that the
city (through acts of its council) had engaged in a pattern and
practice of racial discrimination in housing and had issued
a valid remedial order, the city councilmembers became
obliged to respect the limits thereby placed on their legis-
lative independence.[12]

---

[11] See *Columbus Bd. of Education* v. *Penick*, 443 U. S. 449, 459 (1979)
(once court orders desegregation remedy, "[e]ach instance of a failure or
refusal to fulfill this affirmative duty continues the violation of the Four-
teenth Amendment"). Put another way, remedial defiance by the legisla-
ture circumvents the structural protections afforded the citizenry from un-
constitutional government behavior by a multibranch review process, see
*supra*, at 300–301, by allowing the legislature *de facto* to override the
court's ruling in a particular case that its behavior violates the Fourteenth
Amendment. Cf. *Cooper* v. *Aaron*, 358 U. S. 1, 18 (1958) ("'If the leg-
islatures of the several states may, at will, annul the judgments of the
courts of the United States, and destroy the rights acquired under those
judgments, the constitution itself becomes a solemn mockery'") (quoting
*United States* v. *Peters*, 5 Cranch 115, 136 (1809)).

Indeed, even were the councilmembers to maintain that the Affordable
Housing Ordinance they were required to enact *itself* violated the Con-
stitution, for example, by mandating unjustified racial preferences, the
members would nevertheless be bound by a court order considering yet re-
jecting their constitutional objection. See *Cooper, supra*, at 18 ("[F]ed-
eral judiciary is supreme in the exposition of the law of the Constitution" in
case adjudication). But in any event, the councilmembers raised no seri-
ous substantive objections, constitutional or otherwise, to the ordinance
(which after all was based on the city council-approved Consent Decree).
See, *e. g.*, App. 416 ("The City of Yonkers through its council has repre-
sented to this court that there are no substantive objections to the afford-
able housing ordinance").

[12] Petitioner Chema claims that his legislative discretion is protected by
the First Amendment as well. Characterizing his vote on proposed legis-
lation as core political speech, he contends that the Order infringes his
right to communicate with his constituents through his vote. This at-
tempt to recharacterize the common-law legislative immunity doctrine into

In light of the limited scope of the principle of legislative independence underlying the immunity doctrine, the Court's desire to avoid "perversion of the normal legislative process" by preserving the "sort of calculus in which legislators engage regularly," *ante*, at 280, is misguided. The *result* of the councilmembers' "calculus" is preordained, and the only relevant question is how the court can best encourage—or if necessary coerce—compliance. There is no independent value at this point to replicating a familiar decisionmaking process; certainly there is none so overwhelming as to justify stripping the District Court of a coercive weapon it quite reasonably perceived to be necessary under the circumstances.[13]

---

traditional First Amendment terms is unpersuasive. While the act of publicly voting on legislation arguably contains a communicative element, the act is quintessentially one of governance; voting to implement a remedial decree is best understood as a ministerial step in the process of executing a decision made by government actors with superior authority. Councilmember Chema can no more claim immunity from sanctions for refusing to comply with the District Court's binding order by virtue of the First Amendment than could a Yonkers housing official refuse to issue private developers written exemptions from zoning restrictions as required by the Affordable Housing Ordinance, or indeed than could Judge Sand on remand refuse to issue an order implementing the Court's decision in this case should he disagree with it.

[13] To be sure, imposing sanctions against the city allowed councilmembers to comply with the court order while publicly explaining that their decision to do so was motivated by a desire to promote their constituents' overall interests (even though, as explained above, compliance was mandatory and therefore this appearance of deference to constituent pressure was merely a charade). But any suggestion that city sanctions were somehow less "perverse" than personal sanctions because the former allowed councilmembers more easily to cling to their self-defined political martyrdom is untenable; it seems absurd to suggest that Judge Sand ought to have been concerned with providing the councilmembers guilty of unconscionable behavior a handy public excuse for their belated compliance. Of course, providing the recalcitrant councilmembers with a public-oriented excuse for compliance probably increased the likelihood of successful coercion. But at most this insight suggests that sanctioning the individual councilmembers alone might not have succeeded; it does not fault Judge

Moreover, even if the Court's characterization of personal fines against legislators as "perverse" were persuasive, it would still represent a myopic view of the relevant remedial inquiry. To the extent that equitable limits on federal courts' remedial power are designed to protect against unnecessary judicial intrusion into state or local affairs, it was obviously appropriate for Judge Sand to have considered the fact that the city's accrual of fines would have quickly disrupted every aspect of the daily operation of local government. See *supra*, at 296–297. Particularly when these broader effects are considered, the Court's pronouncement that fining the city is categorically less intrusive than fining the legislators personally is untenable.[14]

---

Sand's decision to impose both sanctions simultaneously, and it hardly renders his action an abuse of discretion.

[14] The Court repeatedly points out that the individual legislators were not parties to the original action. *Ante*, at 274, 276. This accurate observation explains why the lawsuit did not itself contravene the principle underlying the doctrine of legislative immunity. See *supra*, at 300; cf. *Powell* v. *McCormack*, 395 U. S., at 505 ("Freedom of legislative activity . . . [is] fully protected if legislators are relieved of the burden of defending themselves").

It is unclear, however, why the Court repeatedly insists that the individual city councilmembers were not specifically enjoined by the Housing Remedy Order to participate in the remedial process. *Ante*, at 274, 277. As a factual proposition, this insistence is misguided. First, the opening *proviso* of the Housing Remedy Order, which binds the "City of Yonkers, its officers, agents, employees, successors, and all persons in active concert or participation with any of them" to refrain from future discriminatory acts, can easily be understood to refer equally to all substantive provisions of the Order. Second, the Consent Decree, specifically approved by the city council, contemplated that the city would "adopt legislation"; this Decree was universally understood to impose duties directly upon the councilmembers, the only city officials with authority to adopt legislation. Third, the remedial duties were, by operation of law, "binding . . . upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with

## C

I concede that personal sanctions against legislators intuitively may seem less appropriate than more traditional forms of coercing compliance with court orders. But this intuition does not withstand close scrutiny given the circumstances of these cases. When necessary, courts levy personal contempt sanctions against other types of state and local officials for flouting valid court orders, and I see no reason to treat local legislators differently when they are acting outside of their "sphere of legitimate legislative activity." *Tenney*, 341 U. S., at 376.

The key question here, therefore, is whether Judge Sand abused his discretion when he decided not to rely on sanctions against the city alone but also to apply coercive pressure to the recalcitrant councilmembers on an individual basis. Given the city council's consistent defiance and the delicate political situation in Yonkers, Judge Sand was justifiably uncertain as to whether city sanctions alone would coerce compliance at all and, if so, whether they would do so promptly; the longer the delay in compliance, the more likely that city services would be curtailed drastically and that both budgetary constraints and growing racial tensions would undermine the long-term efficacy of the remedial decree. Under these conditions, Judge Sand's decision to supplement the city sanctions with personal fines was surely a sensible approach. The Court's contrary judgment rests on its refusal to take the fierceness of the councilmembers' defi-

---

them who receive actual notice of the order by personal service or otherwise." Fed. Rule Civ. Proc. 65(d).

But even assuming, *arguendo*, that the individual city councilmembers were not named parties in the original Housing Remedy Order, this fact would not preclude a finding of personal contempt given the clear notice afforded by the Contempt Order, and the Court nowhere explains how this fact could make resort to personal sanctions more "intrusive" than resort to city sanctions.

ance seriously, a refusal blind to the scourge of racial politics in Yonkers and dismissive of Judge Sand's wisdom borne of his superior vantage point.

## III

The Court's decision today that Judge Sand abused his remedial discretion by imposing personal fines simultaneously with city fines creates no new principle of law; indeed, it invokes no principle of any sort. But it directs a message to district judges that, despite their repeated and close contact with the various parties and issues, even the most delicate remedial choices by the most conscientious and deliberate judges are subject to being second-guessed by this Court. I hope such a message will not daunt the courage of district courts that, if ever again faced with such protracted defiance, must carefully yet firmly secure compliance with their remedial orders. But I worry that the Court's message will have the unintended effect of emboldening recalcitrant officials continually to test the ultimate reach of the remedial authority of the federal courts, thereby postponing the day when all public officers finally accept that "the responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding." *Cooper* v. *Aaron*, 358 U. S. 1, 26 (1958) (Frankfurter, J., concurring).

I dissent.