**UNITED STATES of America; Yonkers Branch–National Association for the Advancement of Colored People, Plaintiffs–Appellees,**

v.

**YONKERS BOARD OF EDUCATION, Yonkers Community Development Agency, Defendants,**

**City of Yonkers, New York, Defendant–Appellant.**

**No. 952, Docket 90–6257.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1991.

Decided March 4, 1991.

---

Raymond P. Fitzpatrick, Jr., Birmingham, Ala. (J. Michael Cooper, Mason & Fitzpatrick, P.C., of counsel); Jamie A. Hastings, Corp. Counsel, City of Yonkers, N.Y. (Eugene J. Fox, Sp. Counsel, of counsel), for defendant-appellant.

Linda F. Thome, Washington D.C. (John R. Dunne, Asst. Atty. Gen., David K. Flynn, Brian Hefferman, of counsel), for plaintiff-appellee U.S.

Michael H. Sussman, Goshen, N.Y., for plaintiff-appellee Yonkers Branch, NAACP.

Before OAKES, Chief Judge, CARDAMONE and WALKER, Circuit Judges.

PER CURIAM:

This is yet another appeal by the City of Yonkers (the "City") from orders seeking to implement the housing remedy in a civil rights action initiated in 1980 by the United States against the City and the Yonkers Board of Education.

## BACKGROUND

After more than 90 days of trial in 1983 and 1984, the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge,* issued a decision establishing the City's liability for a pattern of intentional racial segregation in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.,* and the Equal Protection Clause of the Fourteenth Amendment. *See United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276 (S.D.N.Y.1985). On May 26, 1986, the district court entered its Housing Remedy Order ("HRO"), obligating the City *inter alia* to provide acceptable sites for 200 units of public housing. *See United States v. Yonkers Bd. of Educ.,* 635 F.Supp. 1577, 1580–81 (S.D.N.Y. 1986). This court affirmed the district court's liability and remedial rulings "in all respects." *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1184 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

Shortly after this court's affirmance of the liability decision and HRO, the parties negotiated an agreement setting forth certain actions that the City would take to implement the HRO. This agreement was entered by the district court on January 28, 1988 as the First Remedial Consent Decree in Equity ("Consent Decree"). The Consent Decree identifies seven sites for the construction of public housing, obligates the City to acquire title by purchase or condemnation to those sites that were privately owned, sets a timetable for the project up to the commencement of construction, and commits the City to adopt, within ninety days, a legislative package of incentives for local developers. We discussed the City's contumacious delay in implementing the incentive legislation in *United States v. Yonkers,* 856 F.2d 444 (2d Cir.1988), *rev'd on other grounds sub nom. Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990).

In December 1988, the Yonkers Municipal Housing Authority ("MHA") issued a Request for Proposals ("RFP") from developers for the construction of public housing on five of the seven sites identified in the Consent Decree. As contemplated by the Consent Decree, the RFP provides for "turnkey" development of the sites: the City would convey title to the developer, the developer would obtain construction financing and build the housing, and, upon completion of the housing, the MHA would purchase the project from the developer. Deluxe Development of New York, Inc. ("Deluxe") was selected as the developer for the first RFP.

The present dispute arises out of three orders, entered on July 24, 1990, July 31, 1990, and August 2, 1990, relating to the five sites named in the RFP. The July 24 order requires the City to transfer the sites to Deluxe prior to the signing of the turnkey contract of sale, and further requires that title to those sites be free and clear of

any defects. The July 31 order rejects the City's request for certain protection against the possibility that the sites someday cease to be used for public housing. The order also notes that the City is under an ongoing obligation to take corrective action with respect to any clouds on title. The August 2 order, among other things, requires the City to clear certain title defects prior to conveyance. The City argues that these orders impermissibly expand the scope of the City's obligations under the HRO and Consent Decree, and therefore constitute an abuse of the district court's discretion. Because we believe that the City has waived its right to raise these arguments on appeal, and because we find the arguments to be without merit, we affirm.

## DISCUSSION

■ Section 10 of the Consent Decree provides:

> The City agrees that, to the extent it relates to the City's obligation to provide sites for the placement of 200 units of public housing, it will seek no further appellate review of the decision ... entitled *United States of America et al. v. Yonkers Board of Education et al.*, 624 F.Supp. 1276 (S.D.N.Y.1985) or of any subsequently entered decree.

According to the City, section 10 bars only those appeals that challenge the City's basic obligation to provide sites. However, by its terms, section 10 also bars appeals from decrees that "relate[ ] to" the City's obligation. Requests to modify the City's obligation are, we believe, "related" to that obligation within the meaning of the provision. Accordingly, because this appeal challenges district court rulings insofar as they deny the City's requests to modify its existing obligations,[1] it is barred by section 10 and must be dismissed.

1. As discussed *infra,* we reject the City's attempts to characterize the orders as "expansions" of the City's existing obligations.

2. A possibility of reverter is the future estate left in the creator or in his successors in interest

Even if section 10 did not bar this appeal, the district court orders would still have to be affirmed, because none of the challenged provisions constituted an abuse of the district court's discretion. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir.1987) (discussing deference owed to district court's choice of remedy in racial discrimination cases), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

■ The City first challenges the district court's denial of the City's request for a possibility of reverter in the sites.[2] The City argues that it is entitled to this future interest in the sites as protection against certain contingencies—*e.g.*, Deluxe fails to build public housing on the sites or the MHA terminates the sites for public housing. However, while in the normal case it might well be appropriate to determine the issue of future interests before execution of a turnkey contract of sale, we do not believe that the district court's refusal to grant a possibility of reverter amounts to an abuse of discretion in this case. First, Judge Sand may, before the HRO is dissolved and the case dismissed, provide that any buildings constructed pursuant to the HRO be used only for public housing. Second, in the unlikely event that the City's fears are realized, the federal courts have adequate equitable powers to remedy the situation. Finally, Judge Sand had good reason to believe that granting the City's request would delay and/or jeopardize implementation of the HRO, which the court properly considered of paramount importance.

■ The next alleged abuse of discretion occurred when the district court refused to rule that, upon conveyance of title to the first five sites, the City was entitled to a *pro rata* release from its obligation to provide sites. Again, we believe the district court exercised its discretion prudently.

upon the simultaneous creation of an estate that will terminate automatically within a period of time defined by the occurrence of a specified event.
N.Y.Est.Powers & Trusts Law § 6–4.5 (McKinney 1967).

There are numerous ways in which the City may still impede the construction of public housing. For example, the City could refuse to clear title defects, refuse to provide normal city services at the sites during and after construction, or refuse to issue occupancy permits when the housing is complete. Given the City's past record for obstruction, the district court was wise not to release it prematurely from its ongoing obligation under section 9 of the Consent Decree to "fully and in good faith cooperate with all persons, parties, and organizations the involvement of which is necessary or desirable for the completion of the process" of constructing the housing.

█ Finally, the City argues that the August 2 order modifies the City's existing obligations by requiring the City to convey the sites free and clear of all encumbrances and clouds on title. However, to the extent that the City appeals the requirement that it identify and clear all encumbrances prospectively, prior to conveyance, the appeal is moot in light of the district court's order of November 29, 1990, which vacated that requirement. To the extent that the City challenges, as a modification of its obligations, the requirement that it defend against any suits arising from defects in the titles it conveys, such challenge is frivolous. The City is obligated under the HRO "to provide *acceptable* sites for ... public housing"[3] (emphasis added). Sites that cannot be used for public housing because of title defects are, quite simply, not "acceptable."

Accordingly, the district court orders are affirmed.

---

3. Similarly the Consent Decree requires the City "to provide the [identified] sites ... for the location of ... public housing."