The **BRONZE SHIELDS,**
**et al., Plaintiffs,**

v.

The **CITY OF NEWARK,**
**et al., Defendants.**

**No. Civ.A.2022–72(JWB).**

United States District Court,
D. New Jersey.

April 17, 2002.

Lester J. Elliott, East Orange, NJ, Pro se.

Rutgers Constitutional Litigation Clinic by Jonathan M. Hyman, Newark, NJ, for plaintiff class.

Joanne Y. Watson, Corporation Counsel by Richard C. Gordon, Assistant Corporation Counsel, City of Newark, Department of Law, Newark, NJ, for Defendants.

## OPINION

BISSELL, Chief Judge.

This matter comes before the Court on its Order to Show Cause, dated February 13, 2002, why Lester J. Elliott ("Mr.Elliott") should not be entitled to equitable relief, despite the City of Newark's ("the City") objection to his appointment as a police officer on the ground that he was not a resident of Newark in August 2000 when he reapplied for that position at the Court's direction. Argument on the Order

to Show Cause was held on March 20, 2002. This is the latest in a series of judicial interventions in this matter since Mr. Elliott began seeking this Court's assistance in securing an appointment to the City's police force. The Court has previously determined that Mr. Elliott is a class member in the above-referenced litigation, which was concluded pursuant to a court-approved Consent Decree ("the Consent Decree"), entered March, 4, 1987, and is entitled to certain rights thereunder.[1]

## I. PRELIMINARY STATEMENT

Mr. Elliott is seeking appointment pursuant to a Consent Decree that concluded a civil rights class action based on allegations of the City's racial discrimination in hiring police officers. The Consent Decree mandates that class members be placed on a preferential hiring list for police officer positions as they open up; in essence, these individuals are given priority over other applicants. It may be fairly said that this priority scheme is the cornerstone of the settlement agreement, for it directly addresses the class members' principal grievance, that is, that they were denied appointment on the basis of unlawful discrimination. In exchange for Newark's promise to follow the consent Decree's priority scheme, the class members relinquished their right to pursue further their claims against the City. The City now seeks to deny a class member the benefits of this bargain on the basis of a purported residency "requirement."

## II. LEGAL OVERVIEW

Questions concerning the validity and applicability of the City's purported requirement must be resolved in the context of certain New Jersey statutes that define the metes and bounds of the proper use of residence in initial police hiring. Since 1972, New Jersey has prohibited a municipality from making residency a requirement for appointment to its police force. N.J.S.A. 40A:14–122.1 (West 2002) (alternately, "Section 14– 122.1" or "the 1972 Statute").[2] The pivotal term employed in the 1972 Statute is "requirement." When used in an employment setting, this word, under its ordinary meaning, is synonymous with a qualification or *sine qua non*, an indispensable condition, in hiring for a particular position.

In sharp contrast to a qualification is the concept of priority in hiring. Priority denotes a preference, one that is accorded to one group over another. A somewhat elementary illustration underscores the difference between these terms. If a grocery list stated that priority among different kinds of fruit should be given to apples over oranges, this would mean that the list's writer would prefer to have apples and, also, that oranges are an acceptable alternative if no apples are available. Were the list to say that apples are a requirement, or a qualification, the purchase of oranges rather than apples would not be acceptable.

A grasp of the different meanings of these terms, *i.e.*, qualification and priority,

---

1. With respect to jurisdiction, the Consent Decree provides, in pertinent part, that "[t]he Court shall retain jurisdiction for the duration of this Decree to interpret, enforce and implement this Decree, including jurisdiction to grant such ancillary relief to enforce the Final Judgment as the Court finds just and proper." (Consent Decree, § II, ¶ C).

2. A related provision, which also became effective in 1972, provides: "In any municipality wherein Title [11A] (Civil Service) of the *Revised Statutes* is operative, applicants for appointment to the police department and force who are not residents of the municipality shall be eligible for appointment thereto notwithstanding the provision of any statute, law, ordinance, rule or regulation to the contrary." N.J.S.A. 40A:14–122.2 (West 2002).

is critical to a proper understanding of New Jersey Statute § 40A:14–123.1a, which became effective on December 21, 1976. N.J.S.A. 40A:14–123.1a (West 2002) (alternately, "§ 14.123.1a" or "the 1976 Statute"). Under the 1976 Statute, which is titled "Police departments; priority of eligibility in accordance with residence for initial appointment," the first paragraph reads: "In any municipality of this State, before any person shall be appointed as a member of the police department and force, the appointing authority *may* classify all the *duly qualified* applicants for the position or positions to be filled in the following classes...." 40A:14–123.1a (emphasis added). It then goes on to assign priority to residents of the municipality (Class I), other residents of the county in which the municipality is situated (Class II), other residents of the State (Class III); and all other "qualified applicants" (Class IV). 40A:123.1a.

Fundamentally, § 14–123.1a does not alter § 14–122.1's prohibition on making residency in the municipality a requirement in police hiring. This is manifest from the fact that the term "qualified" is used in the 1976 Statute to describe applicants in *all* Classes, not just the municipal residents in Class I. Thus, the plain meaning of the 1976 Statute's terms indicates that the 1972 Statute remains fully in force. Rather than abrogating the 1972 Statute's prohibition on making municipal residency a qualification, the later provision merely permits municipalities to prefer some qualified applicants over others. Furthermore, this priority system is not imposed on municipalities; it is voluntary.

Under this analysis of New Jersey law, it is abundantly clear that a municipality cannot impose a municipal residency requirement on initial police hiring. Rather, at most, a municipality's use of residency in the hiring of new police officers is limited to the specific tiered preference system set forth in § 14–123.1a.

Judging from its papers and argument on the February 13, 2002 Order to Show Cause, the City fails to recognize, in general, the relationship between the 1972 and 1976 Statutes as discussed above and, in particular, the underlying differences between the concepts of qualifications and preferences in hiring. Such is apparent from the first sentence of its memorandum of law, which reads: "Mr. Elliott is not *qualify* [sic] to become a police officer candidate of the City of Newark Police Department because he is [sic] not a bone [sic] fide resident of the city at the time he completed his application." (Newark's Br. at 5) (emphasis added).[3] That the City regards non-residence as a bar to police appointment was reinforced repeatedly at oral argument.

The City makes three arguments in support of its view that municipal residency may be considered as a requirement to initial police appointment. First, it argues that the policies underlying the 1976 Statute operate as an effective repeal of the 1972 Statute. This argument is singularly unpersuasive. Had the legislature thought it either wise or expedient to repeal the 1972 Statute, it would have done so, either through express repeal or by employing more expansive language in the 1976 Statute. Significantly, the City does not assert—because it cannot—that the language of the later statute invalidates the earlier one.[4]

---

3. At a number of further points, the brief goes on to characterize Mr. Elliott's non-residency in the City as a disqualification.

4. Indeed, the City itself cites case law that confirms that, under the 1972 and 1976 Statutes, municipalities are prohibited from making residency a requirement in police hiring.

Second, the City argues that a Newark-wide referendum, held on November 2, 1976, should be taken as establishing a tiered preference system for police employment consistent with the 1976 Statute. This argument is also flawed. The referendum in question concerned whether the City's long-standing residency requirement for all municipal posts should apply prospectively. It did not seek to establish any sort of priority system for police hiring. Moreover, it is not reasonable to attach any greater significance to the referendum inasmuch as the 1976 Statute permitting a tiered system did not become effective until seven weeks *after* that referendum was held.

Third, the City maintains that it is entitled to assert that municipal residence is a requirement, a "condition precedent" to employment in the City's counsel's words, because experience has shown that the supply of Class I applicants for open positions is never exhausted, which means that residence is a *de facto* requirement in police hiring. Putting aside for now whether the City has adduced any facts to support this position, all that need be said on this point is that it is negated by the clear and plain language of the governing law. N.J.S.A. 40A:14–122.1 and 123.1a (West 2002). When pressed at argument to identify some principle or rationale that would entitle the City, in its effort to deny appointment to Mr. Elliot, to assert a position that was clearly precluded by the law, counsel proclaimed that the City was simply ignoring and abandoning the requirement of 122.1 and, like other municipalities, was "kind of doing their thing." (Tr. Mar. 20, 2002 at 24:14–19. *See also, id.* at 5: 1–6). The Court declines to depart from the unmistakable import of the governing statutes on such an infirm basis.

Stripped of all its erroneous assertions that municipal residence can serve as a qualification for police officer hiring, the City's position is, at best, that it may deny Mr. Elliott's appointment because it would rather follow the *permissible* priority scheme described in the 1976 Statute rather than the one *mandated* in the Consent Decree. The Court's discussion of the merits of this contention is organized around the following issues: (1) whether, as a threshold matter, the City is entitled to raise in these proceedings the 1976 Statute's priority scheme as a bar to Mr. Elliott's appointment; (2) assuming the City may assert the 1976 Statute's priority scheme, whether the Consent Order precludes its application to Mr. Elliott; and (3) even if that scheme is available and applicable, does it operate to prevent Mr. Elliott's appointment.

## III. DISCUSSION

### A. The City is Not Entitled to Raise the 1976 Statute in These Proceedings.

As a threshold issue, the Court questions whether, in the instant proceedings, the City should be permitted to rely on the 1976 Statute's provision of a limited use for residency as a preference in the hiring

In *City of Newark v. PBA Local 3,* 272 N.J.Super. 31, 639 A.2d 333 (App.Div.1994), the Court observed:

> Until 1972, the City's residency ordinance required even police officers and firemen to reside in the City at the time of appointment and thereafter. This was changed by L.1972, c. 3, effective February 15, 1972, which was codified at N.J.S.A. 40A:14–122.1 and N.J.S.A. 40A:14–9.1, respectively.

> This new law invalidated that portion of the City's residency ordinance which was in existence on February 15, 1972 respecting continued residency of police officers and firemen. See N.J.S.A. 40A:14–122.1 and 9.1. But the residency requirement continued unabated for all who were not exempted from its requirement either by statute or the ordinance.
> (*Id.* at 36).

of its police officers. Before resolving this question, a brief discussion of the pertinent procedural history of this matter is warranted.

### 1. Relevant Procedural History

As early as December 1997, Mr. Elliott began writing this Court, seeking its assistance in having the City process his request to be placed on the preferential hiring list for police officers as set forth in the Consent Decree. At the Court's request, the Constitutional Litigation Clinic of the Rutgers University School of Law, through Jonathan M. Hyman, Esquire, counsel for the plaintiff class herein, prepared and filed a report dated April 9, 1999. That report concluded that there had been violations by the City of Mr. Elliott's rights under the Consent Decree. Following arguments prompted by a February 7, 2000 Order to Show Cause, this Court determined, on June 6, 2000, that the City had violated Mr. Elliott's rights under the Consent Decree and ordered that it promptly and properly consider a renewed application by Mr. Elliott. (Order of June 6, 2000). In essence, this Court offered the City a second chance to correct its mistakes and avoid potentially harsh sanctions. It appears that, sometime in the middle part of 2000 and prior to reapplying, Mr. Elliott moved his residence from Newark to East Orange, New Jersey.

Mr. Elliott continued to write to the Court, indicating that little progress had been made along the road to securing his appointment as a Newark police officer. Following the City's counsel's failure to respond to a letter of inquiry, this Court was again compelled to order the City to appear to account for this lack of progress. (Order to Show Cause of Apr. 12, 2001).

In response to the April 12, 2001 Order to Show Cause, the City raised, for the first time in these proceedings, the issue of Mr. Elliott's change of residence, by its counsel's certification, which stated in pertinent part:

> Mr. Elliott's *qualifications* do not meet the criteria *required* to become a police officer of the city of Newark. Various issues surrounding his application for employment served to *disqualify* him, including the following: He was not a resident of the city of Newark at the time he completed his application to become a City of Newark police officer.

(Gordon Cert., May 7, 2001, ¶ 4) (emphasis added). The City made no mention of a preference system in the nature of that which is authorized by the 1976 Statute. Moreover, counsel certified that this statement was true, based on his investigation.

The Court was dissatisfied with both the City's explanation and its lack of observance of the procedures of the Consent Decree, as well as this Court's June 6, 2000 Order. Therefore on May 14, 2001, the Court ordered sanctions to be assessed against the City unless prompt action was taken on Mr. Elliott's application. (Order of May 17, 2001).

By letter of May 24, 2001, the City informed Mr. Elliott that he was no longer being considered for employment as a police officer for failing to meet certain "Requirements for appointment." (Letter from Police Director Joseph J. Santiago to Lester J. Elliott, dated May 24, 2001). Of the three requirements cited in the letter, two have since become ineffective. As to the remaining "requirement," the letter informed that: An applicant "must be a resident of the City of Newark at the time of appointment." (*Id.*) Nothing in the letter remotely suggested that the City was following a tiered preference system, but instead treated the issue of residency as an indispensable condition of appointment.

Similarly, in another letter, dated August 24, 2001, sent to Mr. Elliott after he supplemented his application, the City once more invoked a residency "requirement" in rejecting his application, though there was nothing said of a tiered preference system. (Letter from Lisa Alexander–Taylor to Lester J. Elliott, dated August 24, 2001).

Following these letters, on October 30, 2001, the Court wrote to the City's counsel inquiring into the nature of the purported residency requirement and the consistency with which it had been applied in recent years. In particular, the Court asked if there were any written or unwritten exceptions to the purported residency requirement for police officers. The City responded with sworn statements of a number of individuals who had presided over police hiring during the pertinent years, which uniformly stated that there were no written exceptions to the "requirement" and two unwritten exceptions, neither of which was applicable to Mr. Elliott. (*See* affidavits of Lt. James J. Dupont, Lt. Robert L. Barr, Lt. Robert M. Embrey and Sgt. Robert J. Freda). Not surprisingly none of the affiants cited, mentioned or alluded to the 1976 Statute's tiered system, under which Mr. Elliott, even in light of the City's assessment of his residency, would have been entitled to be classified as a Class II qualified applicant.

### 2. *Judicial Estoppel*

 The foregoing establishes a basis for the application of judicial estoppel to bar the City from arguing in these proceedings · that Newark treats municipal residency as a priority factor in police hiring, as is contemplated by § 14:123.1a, rather than as a qualification. The doctrine of judicial estoppel was summarized by the Third Circuit in the following manner:

Judicial estoppel, sometimes called the "doctrine against the assertion of inconsistent positions," is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from "playing 'fast and loose with the court.'" "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."

*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir.1996) (internal citations omitted). Three requirements must be met in order to apply judicial estoppel: (1) the party to be estopped must have taken two positions that are irreconcilably inconsistent; (2) that party must have changed positions in bad faith, *i.e.,* with the "intent to play fast and loose with the court"; and (3) the remedy must be tailored to address the harm identified. *Montrose Med. Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779–80 (3d Cir.2001).

First, prior to the filing of its papers in opposition to the February 13, 2002 Order to Show Cause, the City never took the position that it administered its hiring of police officers under the type of scheme articulated in the 1976 Statute. To the contrary, throughout these proceedings, it argued that Mr. Elliott's residence outside of Newark was an absolute bar to his appointment as a police officer. Such a position is irreconcilably inconsistent with the existence of a tiered system that accords municipal residents a preference over nonresidents, but does not elevate municipal residency to the level of a qualification for police employment. Second, the surrounding circumstances persuade

the Court to find that this change was made only for tactical advantage, and, therefore, in bad faith. Finally, estoppel in this case is appropriately tailored to prevent the City from exploiting a position which, at no point in these proceedings, it had chosen to advance.

█ In addition, it cannot be questioned that the City has benefitted from taking its prior position that residency was a requirement of employment. *Ryan Operations*, 81 F.3d at 361 (stating that doctrine of judicial estoppel is particularly appropriate in situations in which the party benefitted from its original position) (citing cases). That position offered what appeared to be a "clean" ground on which to deny Mr. Elliott's appointment, one that the Court was prepared to accept on the representation from the City's counsel. (*See* Letter from Judge Bissell to Richard Gordon, dated Oct. 30, 2001). Only through the Court's own research were the controlling state statutes revealed. Simply put, if ever there were a case for judicial estoppel, it is this case.[5]

### 3. Factual Insufficiency

Even were the Court disinclined to impose estoppel on the City, it would, nonetheless, reject as factually unsupported the City's nascent assertion that its use of residence in police hiring is consonant with § 14–123.1a. The instant Order to Show Cause specifically identified the 1976 Statute as its point of interest in assessing whether Mr. Elliot should be entitled to relief. The City's papers and the argument of its counsel at the hearing, however, set forth nothing more than self-serving assertions in support of its reliance on the 1976 Statute. No example of a tiered list of candidates for the position of police officer has been produced by the City. No proofs were presented regarding the number of applicants who have fallen into the various tiered classes relative to the number of job openings. Stated bluntly, the City has expended the Court's willingness to accept on faith its representations. Therefore, on the facts, it is the determination of this Court that the City has not demonstrated that it has implemented a tiered priority system in the mold of the 1976 Statute.

### B. The Consent Decree Precludes the City's Efforts to Disqualify or "De-Prioritize" Mr. Elliott's Appointment on the Basis of Non–Residency in Newark.

█ For the sake of thoroughness, the Court will address alternative grounds that support its decision that the City cannot deny Mr. Elliott's appointment based on his current residency. Assuming both that the 1976 Statute is a viable part of the City's police hiring activities and that the City is entitled to take this position, it is considered whether the application of that provision to Mr. Elliott conflicts with and, in that event, supersedes the court-approved Consent Decree.

█ The Consent Decree vests the Court with the authority to interpret, enforce and implement the Decree. (Consent Decree, § II, ¶ C). Moreover, the Third Circuit has recognized that a court has "inherent power to enforce a consent decree in response to a party's non-compliance, and to modify a decree in response to changed circumstances." *Holland v.*

---

**5.** The Court's research did not reveal any Third Circuit rule that makes application of judicial estoppel against a public entity subject to additional considerations, as is the case when a party asserts equitable estoppel against the government. On this point, the Court finds persuasive the thorough discussion of the court in *Czajkowski v. City of Chicago*, No. 90 C 3201, 1993 WL 11896, at *2–3 (N.D.Ill., Jan. 19, 1993), concluding that special circumstances are not warranted when the party subject to judicial estoppel is the government.

*N.J. Dep't of Corr.,* 246 F.3d 267, 270 (3d Cir.2001). Also, the Court has broad equitable power to fashion a remedy in undertaking compliance enforcement. (*Id.*) Speaking to this point, the Supreme Court has stated that "[w]hen a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers." *Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990).

As discussed above, the primary affirmative relief granted to class members in the Consent Decree was assigning them to a "preferential hiring list," (Consent Decree, § VII), which essentially gave them priority in being hired for open positions with the City's police department. As to the hiring of these preferred individuals, it is clear that the Consent Decree removed the City's discretion to deny them appointment so long as they were qualified. This was the cost the City was willing to pay to avoid the risk of an embarrassing and costly final judgment had the litigation proceeded.

Though it precluded specific factors as screening criteria, (*see* Consent Decree, § VI, ¶ C), the Consent Decree permitted the City flexibility in setting standards for a candidate's qualification to serve as a police officer: "The criteria to be used in screening class members and named plaintiffs shall be those used in screening police officer candidates after this Decree becomes effective; a class member or named plaintiff may be disapproved if he does not meet such criteria." (Consent Decree, § VII, ¶ G).

In light of terms employed and this paragraphs' function in the overall settlement plan, the Court construes that residency does not fall within this provision's allowance for "criteria to be used in screening class members." As discussed in preceding sections of this Opinion, the most the state law allows in regard to the use of municipal residency in hiring of police officers is the preference scheme described in the 1976 Statute. On the other hand, paragraph G of section VII of the Consent Decree essentially speaks to qualifications. Its use of the terms of "disapprove[ ]," "bar to employment," and "qualified to be a police officer" is more indicative of setting the *requirements* for the job of police officer than the *priority* in which qualified individuals are hired for that job. Were it otherwise, this provision would serve as a loophole through which a proverbial truck could be driven; it would undercut severely the Consent Decree's aim of elevating qualified class members to the top of the list, notwithstanding the individual's having or lacking certain preferential characteristics that did not rise to the level of job requirements.

In short, the Court determines that the City's purported application of the preferential hiring scheme set forth in § 14–123.1a runs afoul of the Consent Decree that terminated the class action in this matter. Though the City might have sought to apply the 1976 Statute's system in the normal course, this is not the usual situation. To permit the City to impose factors, such as municipal residence, on the hiring of Mr. Elliott that are not *bona fide* requirements for the position he seeks would vitiate the efficacy of the Consent Decree and disrupt the balance of interests reached therein.

### C. Principles of Equity Direct that Mr. Elliott's Residency, Assuming its Applicability, be Determined as of the Date of His First Application to the Police Force.

█ Finally, were the Court inclined to find that the 1976 Statute's plan is applicable to Mr. Elliott, it would, nonetheless, conclude that he could properly be considered a Class I qualified applicant, entitling him to immediate hiring.

It is undisputed that Mr. Elliott lived in Newark for many years and that, while a resident, he sought appointment as a police officer with the City. This appointment was delayed for a number of years through the course of the Bronze Shields litigation and these proceedings. His move to East Orange occurred only recently, relative to the date of his original efforts to secure appointment. Much of the recent delay in processing his candidacy is attributable to the City's asserting erroneous and unsupportable grounds to deny his appointment. Moreover, as determined previously by the Court, the City denied Mr. Elliott his procedural rights under the Consent Decree. Finally, the record is replete with instances of the City's inattention, or unwillingness, in moving this matter toward a speedy resolution, consistent with Mr. Elliott's legal rights. This pattern of behavior appears calculated to deny Mr. Elliott's rights under the Consent Decree, and, but for it, Mr. Elliott long ago would have been considered a Class I applicant. Now, having repeatedly evaded its legal obligations, the City claims that it is entitled to reject Mr. Elliott based on a recent change in his residence. To allow the City to prevail on this argument would be to permit a rigid principle of law to smother the factual realities to which it might be applied. *Graziano v. Grant*, 326 N.J.Super. 328, 342, 741 A.2d 156 (App.Div.1999). Principles of fairness and justice counsel that Mr. Elliott's residency be treated as that which he had at the time of his original application. (*Id.*) ("Equity will not permit a wrong to be suffered without affording the appropriate remedy.") ("[E]quity regards as done that which ought to be done.") (citing New Jersey cases).

Taking such an approach is neither unfair nor impractical. Such retrospective treatment is certainly consistent with provisions of the Consent Decree that mandate that class members, such as Mr. Elliott, be treated *nunc pro tunc* for a variety of purposes, for instance: maximum age limitation for police officers will not be a bar to employment of any class member who satisfied the age requirement at the time of his initial application, (Consent Decree, § VII, ¶ G); class member need not retake Civil Service physical performance test to be deemed qualified, (*id.*, § VII, ¶ H); class member to be treated, once hired, for record and seniority (but not salary or benefits) purposes as if he had been hired when his name was first reached on a Civil Service Newark police officer eligibility list, (*id.*, § VII, ¶ J). Only by taking such a flexible approach can the courts do justice when remedying years-old transgressions.

Furthermore, to allow the appointment of Mr. Elliott despite his current residency would not impair seriously the policy goals of preferring residents to nonresidents in the hiring of police officers. East Orange is geographically contiguous with Newark, which weakens any claim that Mr. Elliott's current residency would substantially affect his ability to respond quickly to local emergencies. Moreover, his many years of residence in Newark also eliminate any issue as to his special knowledge, *vel non*, of the City and its residents that is acquired only by living there.[6]

### D. Remedies

■ At oral argument, discussions included potential remedies to be afforded to Mr. Elliott in light of the Court's rulings expressed above. Undoubtedly, the Order implementing this Opinion should provide

---

**6.** Finally, the Court notes (as acknowledged by all parties) that nothing prevents an officer from moving from Newark immediately following his appointment without losing his position. *See, e.g.,* Tr. March 20, 2002 at 10:22–11:5.

for steps calculated to promote Mr. Elliott's joining the Newark Police Department as promptly as possible. These should include directives that no considerations other than those expressly provided for by the Consent Decree can be brought to bear upon Mr. Elliott's application. The Court would also be very much inclined to direct that Mr. Elliott be admitted into a training class, even if one has to be initiated for him alone, within 20 days of the entry of any final order. Mr. Elliott has requested a *nunc pro tunc* hiring date, with all salary and benefits attendant thereto, to coincide with that of officers who have been sworn to duty after completion of a training class conducted in September 2001 from which Mr. Elliott was improperly excluded. The Court also raised the prospect of an award to Mr. Elliott of a reasonable attorney's fee reflecting his extensive, now ultimately successful, efforts to secure on the Newark Police Force a position that is rightfully his. Further research has revealed, however, that such awards are not allowed in cases where a litigant appears *pro se. See Kay v. Ehrler,* 499 U.S. 432, 435, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991); *Owens–El v. Robinson,* 694 F.2d 941 (3d Cir.1982); *Pitts v. Vaughn,* 679 F.2d 311 (3d Cir. 1982).

Confirming the Court's request at oral argument, Mr. Hyman is to undertake the task of drafting a form of Order reflecting the decision set forth above and presenting remedies which appear to be appropriate in the present matter. That form of Order shall be presented on notice to both Mr. Elliott and counsel for the City of Newark, to which each may respond within 7 days of receipt thereof, pursuant to Local Civil Rule 58.1(b). If a dispute develops regarding the contents of the Order to be entered by the Court, it will probably be resolved upon the forms of Order and written arguments presented. Should the Court decide, however, to hold oral argu-

ment to settle the form of Order, all parties will be so advised.

### CONCLUSION

In sum, the City's misguided effort to bar Mr. Elliott from appointment to its police force based on his residence is the latest in a line of insubstantial, baseless objections. The City must faithfully recognize Mr. Elliott's rights under the court-approved Consent Decree, not seek to undermine them in a systematic fashion. At each stage, it has taken this Court's intervention to ensure that Mr. Elliott is treated fairly and in accordance with the provisions of the Consent Decree. Therefore, it is not surprising that now, once again, the Court must exercise its powers to enforce those mandates. The Court will finalize and enter an order in the manner described in section 3.D above.